**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Prestige Industries LLC, | : | Case No. 17-10186 (KG) |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF JONATHAN FUNG
IN SUPPORT OF FIRST DAY MOTIONS**

I, Jonathan Fung, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of the above-captioned debtor, Prestige Industries LLC (the "Debtor"). In this capacity, I am generally familiar with the Debtor's day-to-day operations, business, and financial affairs.

2. On the date hereof (the "Petition Date") the Debtor filed a voluntary petition with the Court for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor intends to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this Chapter 11 case and, as of the date of the filing of this declaration (this "Declaration"), no official committees have been appointed or designated.

3. To enable the Debtor to reduce the adverse effects of the commencement of this Chapter 11 case on its organization, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtor to effectively

transition into Chapter 11 and minimize disruption, thereby preserving and maximizing the value of the Debtor's estate.

4. I am familiar with the contents of each First Day Motion (including the exhibits and schedules in support thereof), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

5. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6. Part I of this Declaration describes the Debtor's history and operations, its capital and debt structure and the circumstances surrounding the commencement of this Chapter 11 case. Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

## I. BACKGROUND

### A. The Debtor's History and Corporate Structure

7. Prestige Industries LLC is a market leading provider of commercial laundry services to the hospitality industry in the greater New York City area. Headquartered in Lyndhurst, New Jersey, the Debtor operates two laundry facilities strategically positioned throughout the region in order to maximize efficiency while providing superior quality services

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

to its customers. The Debtor provides a full suite of laundry services to a wide-ranging customer base that includes premium hotel chains and signature boutique hotels. In an industry that is characterized by numerous, less sophisticated "mom-and-pop" laundry operations, the Debtor benefits from a significant competitive advantage for its full-service, professionally managed hospitality laundry services.

8. Prestige offers a full suite of commercial laundry services to hospitality customers including:

- Linen and Terry: processing, cleaning and transport of hospitality bed linens and towels;
- Household: cleaning of all other items in a hotel room including, but not limited to, drapery, duvet covers and pillows;
- Food and Beverage: cleaning of table cloths, napkins and other items associated with restaurants located within hotels;
- Valet: cleaning of employee uniforms and guest laundry items;
- Stocking: staffing of on-site employees to provide hotel support in stocking linens and terry; and
- Laundry Management: operation of on-site laundry services on behalf of a hotel.

The Debtor's operational capacity (weekly average of 260,000 clean pounds processed per day) affords Prestige the ability to service over 90 hotels throughout the greater New York City area and process over 100 million pounds annually. The Debtor has contracts with large, marquee hotel brands as well as contracts with numerous high-end boutique hotels.

9. Prestige operates two laundry facilities strategically positioned throughout the region in order to maximize efficiency and provide unparalleled services to its customers. The acquisition of the Paterson, New Jersey ("Paterson") facility in 2008 and the construction of the

North Bergen, New Jersey ("North Bergen") facility helped to further solidify the Debtor's core competencies of higher quality services and the market leading scale that uniquely qualifies Prestige to service high volume accounts. Until the end of 2016, the Debtor also operated a plant in Bay Shore, New York ("Bay Shore") which has since been shuttered effective January 15, 2017.

10. The Debtor was organized as a limited liability Debtor in 2012. Prior to the formation of the LLC, the Debtor was organized as a corporation.

11. The Debtor has its headquarters office at 1099 Wall Street West, Suite 100, Lyndhurst, NJ.

12. As of the Petition Date, the Debtor employed approximately 582 individuals in full and part-time capacities. Certain of the Debtor's North Bergen employees are members of Union Local 811. Certain of the Debtor's Paterson employees are members of Union Local 2013. In addition, certain of the Debtor's hotel- based employees are members of Union Local 6.

13. The Debtor maintains long-standing relationships with some of the largest and most well-known premium and boutique hotels and hotel chains in the greater New York City area. With over 90 customers under contract, Debtor benefits from a diversified customer base.

14. The Debtor is the largest hospitality laundry services provider in the greater New York City area by both volume and revenue and is one of a select few launderers with the ability to service hotel accounts. The Debtor has the capacity to process significantly more volume than its closest competitor and therefore is able to provide the convenience of a one-stop services provider to customers with volume requirements that cannot be met by any of Debtor's limited competition.

119423788_7

15. The Debtor was incorporated in New York in 1995 when the Debtor's founder, Joe Cho, purchased a retail laundry and dry cleaning facility in Manhattan. The Debtor acquired its first linen cleaning facility in Bay Shore, New York in 2005, however, Prestige remained a predominantly retail operation through 2006. The Bay Shore facility became fully operational in 2007 and, after servicing numerous standalone and smaller hotel chains, the Debtor's first major hotel contract was signed in 2008. Once the Bay Shore facility reached 100% utilization, the Debtor expanded into New Jersey with its acquisition of its second linen facility in Paterson, New Jersey in 2008.

16. The Debtor began the build-out of its first greenfield facility in North Bergen, New Jersey in 2012. The plant was completed in 2013 and the North Bergen facility became the largest hospitality services facility on the East Coast and the Debtor's preeminent operation. The Debtor made the decision to shut down the Bay Shore facility after the sudden and complete failure of its primary tunnel washer system. As of January 15, 2017, the Debtor began the process of moving the Bay Shore equipment and reallocating the Bay Shore volume to the North Bergen and Paterson operations.

17. In 2008, the Debtor leased the Paterson facility from a competitor. The facility provides the full suite of commercial laundry services. A portion of the Paterson facility has been sublet.

18. Stuart Newman is the sole manager of the Debtor, an LLC.

19. I serve as the Chief Executive Officer of the Debtor. Upon approval of the Court, Robert J. Iomazzo will serve as Chief Restructuring Officer of the Debtor.

20. The Debtor does not own any real estate; all of its locations are leased.

B. **The Debtor's Debt and Capital Structure**

21. The Debtor's ownership is summarized as follows:

|  | Common Units "A" | Series A Preferred Units | Series B Preferred Units | Series C Preferred Units | Total |
|---|---|---|---|---|---|
| Sang Cho | $ 100,008.42 | $ - | $ - | $ 116,670.00 | $ 216,678.42 |
| Cho Holdings LLC | $ 732,515.04 | $ - | $ - | $ - | $ 732,515.04 |
| St. Cloud Capital Partners II, LP | $ - | $ 1,863,627.36 | $ - | $ 3,218,320.69 | $ 5,081,948.05 |
| St. Cloud/CPEC (Holdco Blocker) LP | $ - | $ 1,136,372.64 | $ - | $ 1,962,491.75 | $ 3,098,864.39 |
| Byung Woo Cho | $ - | $ - | $ 650,000.00 | $ - | $ 650,000.00 |
| Total | $ 832,523.46 | $ 3,000,000.00 | $ 650,000.00 | $ 5,297,482.44 | $ 9,780,005.90 |

Series B and C Preferred Units are non-voting.

22. The Debtor's debt structure as of the period just prior to the Petition Date is summarized as follows:

| Wells Fargo - Line of Credit | 2,279,568.00 |
|---|---|
| Wells Fargo Term A, L/T | 481,216.35 |
| Wells Fargo Term CapEx Loan | 510,331.99 |
|  |  |
| St. Cloud - 10% Note 1 Principal, L/T | 6,240,000.00 |
| St. Cloud - 10% Note 1 PIK Interest, L/T | 3,507,606.33 |
| St. Cloud - 10% Note 2 Principal, L/T | 1,500,000.00 |
| St. Cloud - 10% Note 2 PIK Interest, L/T | 1,108,285.82 |
|  |  |
| Medley - 10% Note, L/T | 5,760,000.00 |
| Medley - 3% PIK Interest, L/T | 3,088,673.99 |

6

The Wells Fargo debt is secured by a first priority lien an substantially all assets of the Debtor.

### C.  Events Leading to the Commencement of this Chapter 11 Case

23.  The Debtor experienced rapid growth from 2007 through 2011 as it expanded capacity through the acquisition of its Paterson facility and continued to add new hotel customers and further penetrate the hospitality industry in the greater New York City area. In 2012, Prestige began the build-out of its first greenfield facility in North Bergen, New Jersey. Construction delays and other challenges encountered during the build-out resulted in higher than anticipated costs and a significant delay in completion. The plant, which was ultimately completed in 2013, is the largest hospitality services facility on the East Coast and the Debtor's preeminent operation. Although the plant was operational, the North Bergen facility was not generating enough incremental revenue to fully offset the added costs for the first two years following its completion.

24.  During this time, the Debtor also began to experience challenges at its Paterson, New Jersey facility. Staffing constraints and a lack of adequate operational management in Paterson resulted in a high rate of employee turnover, excess temporary labor costs and delays in service turnaround time. These issues, coupled with the operational losses and challenges faced during construction of the North Bergen facility, negatively impacted the Debtor's liquidity.

25.  Despite these challenges, the Debtor has remained profitable on a consolidated EBITDA basis. However, in order to improve profitability, cash flow and stability, the Debtor has taken meaningful steps towards rectifying the recent operational and liquidity issues. These steps include:

- Improving the management of the Paterson facility to increase employee satisfaction and reduce turnover as well as resolve efficiency and turnaround challenges;

- Rationalizing headcount in November 2016;

7

119423788_7

- Engaging the assistance of a turnaround consultant to assist in managing cash flow during this period of tight liquidity; and

- Shuttering the Bay Shore facility effective January 15, 2017 (after a sudden and complete failure of its primary tunnel washer system) and moving the equipment and reallocating the volume to the North Bergen and Paterson operations.

26. Despite these steps, the Debtor's debt burden remains unsustainable. As such, the Debtor has made the difficult but necessary decision to seek the protections of Chapter 11 in this Court, in which forum it believes it can effectuate an orderly sale of its business as a going concern and make distributions to creditors.

D. **Objectives of this Chapter 11 Case**

27. The Debtor intends to pursue the sale of its assets as a going concern, to be followed by a liquidating Chapter 11 Plan.

II. **FIRST DAY MOTIONS**

28. Concurrent with the filing of its Chapter 11 petition, the Debtor has filed the First Day Motions. The Debtor requests that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in minimizing disruption in the Debtor's operations and maximizing value for the benefit of all parties in interest.

29. The relief sought in the First Day Motions will diminish the adverse impact of the filing of this case on the Debtor, its employees, customers, and vendors. I believe that the relief sought in each of the First Day Motions is essential to enable the Debtor to make a seamless transition into Chapter 11 and operate effectively as a debtor-in-possession. I believe that the First Day Motions are tailored to address those matters that require urgent and immediate

8

attention by this Court in order to sustain the value and the viability of the Debtor's operations and estate.

A. **Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Renew Prepetition Insurance Policies and Pay All Obligations in Respect Thereof and (II) Granting Related Relief (the "Insurance Motion")**

30. In connection with the operation and management of its business, the Debtor maintains numerous insurance policies, providing coverage for, among other things, commercial property, automotive, general liability, umbrella, and workers compensation (collectively, the "Insurance Policies"). A Schedule of the Insurance Policies is attached to the Insurance Motion.

31. The Debtor believes that the continuation of the Insurance Policies is essential to the ongoing operation of the Debtor's business.

32. By the Insurance Motion, the Debtor requests authority to continue the Insurance Policies uninterrupted and pay any pre- or post-petition amounts related to the Insurance Policies to the extent that the Debtor determines, in its discretion, that payment is necessary or appropriate.

B. **Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and (II) Granting Related Relief (the "Taxes Motion")**

33. In the ordinary course of its business, the Debtor incurs certain tax obligations including New Jersey sales and use taxes that must be paid in order for the Debtor to continue to operate its business.

34. Accordingly, by the Taxes Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to pay certain tax obligations as they come due, certain of which may relate to the prepetition period.

35. Payment of these obligations in the ordinary course of business is essential to the Debtor's ability to continue operating its business in compliance with state and federal law and

without incurring interest and penalties on unpaid tax obligations. As such, I believe, and the Debtor submits, that the relief requested in the Taxes Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest and should be approved.

### C. Motion of the Debtor for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utility Motion")

36. In the ordinary course of business, the Debtor obtains gas, electric, data/internet and other similar utility services provided by a number of utility companies (the "Utility Providers"). The Utility Providers service the Debtor's facilities in North Bergen, NJ and Paterson, NJ and its offices in Lyndhurst, NJ. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and reorganization efforts. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to provide services to customers. Such a result could seriously jeopardize the Debtor's reorganization efforts and, ultimately, creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during this Chapter 11 case.

37. By the Utility Motion, the Debtor seeks the entry of interim and final orders: (a) determining that its Utility Providers have been provided with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code; (b) approving the Debtor's proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtor's proposed adequate assurance procedures; and (e) determining that the Debtor is not required to provide any additional adequate assurance, beyond what is proposed by the Utility Motion.

119423788_7

38. Such relief is necessary to enable the Debtor to continue its business operations uninterrupted by threats of potential termination of, suspension or interruption in utility services. Accordingly, I believe, and the Debtor submits, that the relief requested in the Utility Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest and, as such, should be approved.

**D.    Motion of Debtors to Pay Certain Pre-Petition Payroll and Various Employee Benefit Expenses Pursuant to 11 U.S.C. §§ 105(a)(1), 502(f) and 507(a)(4) (the "<u>Wages Motion</u>")**

39. To minimize the personal hardship that the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtor's workforce during this critical time, by the Wages Motion, the Debtor seeks authority to pay and honor, in its sole discretion, certain prepetition claims for, among other items: wages, salaries, and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums, taxes, and retirement contributions), health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, life insurance, long-term and short-term disability coverage, floating holidays and all other benefits that the Debtor has historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

40. In an abundance of caution, the Debtor requests the right to modify, change, and discontinue any of its employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during this Chapter 11 case in its sole discretion without the need for further Court approval.

41. The Debtor's employees have been and continue to be critical to the Debtor's business. Accordingly, even in a difficult time, it is my belief that there is ample justification for

11

the relief requested in the Wages Motion and that the granting of such relief is in the best interests of the Debtor, its estate, and all parties in interest to this case.

> **E.  Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Continued Use of the Debtor's Existing Bank Accounts; (II) Waiving Certain United States Trustee Requirements; and (III) Granting Related Relief (the "Bank Accounts Motion")**

42. The Debtor seeks entry of interim and final orders authorizing the Debtor to maintain its existing Bank Accounts and Business Forms. The Debtor also requests that the Court authorize the Debtor's banks to continue to maintain, service and administer the Bank Accounts.

43. The Debtor further requests that it be authorized to continue to use all correspondence and business forms, including books and records which existed immediately before the Petition Date, as the changing of Business Forms would be costly, burdensome, and disruptive at this time.

44. I believe that the relief requested in the Bank Accounts Motion is essential to facilitating a seamless transition into Chapter 11. Accordingly, I believe that approval of the relief sought in the Bank Accounts Motion is in the best interest of the Debtor's estate, its creditors, and all parties in interest.

> **F.  Motion for Entry of Interim and Final Orders: (I) Authorizing it to Obtain Post-Petition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Authorizing it to Enter into the Debtor-in-Possession Credit Agreement, and (III) Granting Administrative Priority Claims to DIP Lender Pursuant to Section 364 of the Bankruptcy Code and Modifying the Automatic Stay to Implement the Terms of the DIP Order (the "DIP Motion").**

45. By the DIP Motion, the Debtor the Debtor seeks (a) entry of interim and final orders authorizing the Debtor to (i) obtain loans in an aggregate principal amount not to exceed the amount stated in the DIP Motion, (ii) enter into the DIP Credit Agreement and the agreements and instruments contemplated thereby, and (iii) grant administrative priority claims

12

119423788_7

to Wells Fargo Bank (the "<u>DIP Lender</u>") in accordance with the DIP Credit Agreement documents; (b) modification of the automatic stay to the extent necessary to permit the Debtor and the DIP Lender to implement the terms of the DIP financing; (c) a final hearing on the DIP Motion to be held within twenty-five (25) days after the entry of the Interim Order (as defined in the DIP Motion); and (d) an emergency interim hearing on the DIP Motion be held for the Court to consider entry of the Interim Order, which authorizes the Debtor to borrow funds under the DIP Credit Agreement, on an interim basis, up to an aggregate principal amount not to exceed the amount stated in the DIP Motion.

46. The DIP Motion also requests authorization for the Debtor to use Cash Collateral in accordance with a cash collateral budget attached to the Motion.

47. In the absence of access to a DIP credit facility and the use of cash collateral, the Debtor cannot continue operations, pursue an orderly sale of its assets, or otherwise preserve going concern value

48. Wells Fargo Bank has agreed to extend post-petition DIP financing to the Debtor on a secured basis and in exchange for allowed administrative priority claims in this Chapter 11 case, in accordance with the DIP Credit Agreement and the DIP Orders. The Debtor believes that these are the best terms on which it could obtain critical post-petition financing. In the absence of such funding, the Debtor would need to shutter its operation immediately and pursue a fire sale of assets. Such a result benefits no one.

49. Therefore, I believe and the Debtor submits that the use of the DIP Facility and use of cash collateral, on the terms set forth in the proposed DIP Credit Agreement, Budget, and DIP Orders is in the best interests of the Debtor, the estate, and all parties in interest. As such, the relief requested in the DIP Motion should be granted.

## III. CONCLUSION

50. For all of the foregoing reasons and those more fully set forth in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as the Court may deem appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information, and belief as set forth in this Declaration.

Dated: January 30, 2017                                 /s/Jonathan Fung
                                                                        Jonathan Fung