**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Prestige Industries LLC, | : | Case No. 17-10186 (KG) |
| | : | |
| Debtor. | : | |

**MOTION OF PRESTIGE INDUSTRIES LLC FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING IT TO OBTAIN TEMPORARY AND PERMANENT POST-PETITION FINANCING PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING IT TO ENTER INTO THE DEBTOR-IN-POSSESSION CREDIT AGREEMENTS, AND (III) GRANTING ADMINISTRATIVE PRIORITY CLAIMS TO DIP LENDERS PURSUANT TO SECTION 364 OF BANKRUPTCY CODE**
**AND MODIFYING THE AUTOMATIC STAY TO IMPLEMENT THE TERMS OF THE DIP ORDER**

Prestige Industries LLC the above-captioned debtor and debtor-in-possession (the "Debtor"), by undersigned proposed counsel, respectfully represents:

**Bankruptcy Rule 4001 and Local Rule 4001-2 Concise Statement**

1. By this motion (this "Motion"), the Debtor requests (a) entry of an interim order (the "Interim Order") and final order (the "Final Order" and together with the Interim Order, the "DIP Orders") authorizing the Debtor to, among other things: (1) obtain loans and advances from the Debtor's pre-petition senior secured lender, Wells Fargo Bank ("Wells"), and other financial accommodations, in an aggregate principal amount not to exceed $5,200,000, inclusive of prepetition balances (the "Temporary DIP Facility" or "Temporary DIP Loan"), pursuant to sections 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), (2) enter into a Ratification and Amendment Agreement with Wells and the agreements and instruments contemplated thereby (the "Wells DIP Agreement") and to perform such other and further acts as

may be required in connection with the Wells DIP Agreement, (iii) obtain loans and advances from a replacement lender, Rosenthal & Rosenthal, Inc. ("Rosenthal" and, with Wells, the "DIP Lenders") and other financial accommodations, in an aggregate principal amount not to exceed $5,200,000 (the "Permanent DIP Facility" or "Permanent DIP Loan"), pursuant to sections 363 and 364 of title 11 of the Bankruptcy Code and (3) enter into a Debtor-In-Possession Credit Agreement with Rosenthal and the agreements and instruments contemplated thereby (the "Rosenthal DIP Agreement" and with the Wells DIP Agreement, the "DIP Agreements") and to perform such other and further acts as may be required in connection with the Rosenthal DIP Agreement, and (4) grant administrative priority claims to the DIP Lenders in accordance with the DIP Agreements and the DIP Orders to secure any and all of the DIP Obligations (as hereinafter defined); (b) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor and the DIP Lenders to implement the terms of the DIP Orders; (c) pursuant to Rule 4001 of the Bankruptcy Rules, that an emergency interim hearing on the Motion (the "Interim Hearing") be held for this Court to consider entry of the Interim Order, which authorizes the Debtor to borrow additional funds under the Wells DIP Agreement, on an interim basis, up to an aggregate increase in the outstanding principal loan balance not to exceed $725,000  (the "Interim Amount").  and (d) that this Court schedule the Final Hearing for the entry of a Final Order on the Motion to be held within twenty-one (21) days after the entry of the Interim Order. A copy of the proposed Interim Order is attached hereto as **Exhibit A**.   A copy of the Wells DIP Agreement is attached hereto as **Exhibit B**.  A copy of the proposed Permanent DIP Order is attached hereto as **Exhibit C**.  A copy of the Rosenthal DIP Agreement is attached hereto as **Exhibit D**.

2. Material provisions of the Wells DIP Agreement, which provides for the ratification of the pre-petition credit agreement with modifications, are set forth in the following sections of the DIP Agreement or the Interim DIP Order. Items marked with an asterisk∗ are required to be highlighted by Local Rule 4001-2(a)(i).

  a. ***Borrower***: Prestige Industries, LLC [DIP Agreement, page 3].

  b. ***DIP Lender***: Wells Fargo Bank [DIP Agreement, page 1].

  c. ***DIP Facility Amount***: A maximum amount outstanding of $5,200,000, which represents no change in the maximum amount of the pre-petition credit facility, and which may be drawn by the Debtor in periodic advances limited by an availability formula. The Debtor seeks interim approval to borrow up to $725,000 in addition to the current loan balance of approximately $3,275,000. [DIP Agreement, Section 1.2(c). Amendments to Definitions (page 7)].

  d. ***Interest Rate***: The effective non-default interest rate is the prime rate plus 2% on line of credit advances and the prime rate plus 2.5& on the term loan obligations. [DIP Agreement, Section 1.2(h), Amendments Definitions (page 7)].

  e. ***Fee:*** There is a financing facility fee of up to $75,000, $25,000 of which will be paid immediately and, only if Wells has not been paid in full, additional instalments of $25,000 each due 30 and 60 days thereafter. [DIP Agreement, DIP Section 6, DIP Facility Fee (page 16)].

  f. ***Repayment of Loan***: The Debtor agrees to repay in full all outstanding principal amounts of the Loan on the Maturity Date which is the earliest to occur of (a) June 30, 2017, (b) thirty (30) days after the entry of the Interim Financing Order if the Permanent Financing Order has not been entered prior to the expiration of such thirty (30) day period (or such longer period if consented to in writing by the Lender), (c) the effective date of a plan of reorganization filed in the Chapter 11 Case pursuant to an order entered by the Bankruptcy Court, (d) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any Debtor to a Chapter 7, (e) the date this Agreement is otherwise terminated for any reason whatsoever (including pursuant to Section 12.2) pursuant to the terms of this Agreement, (f) subject to the Financing Order, the acceleration of the Obligations or termination of the Commitments hereunder, including without limitation, as a result of the occurrence of an Event of Default, (g) the sale of all or substantially all of the Debtors' assets. [DIP Agreement, Section 1.2(k), Amendments Definitions (page 8)].

  g. ***Carve-Out***: The Lender's claims are subject to a carve-out which is defined as the sum of (i) all allowed administrative expenses pursuant to 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Bankruptcy Court and pursuant to

    28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code as determined by agreement of the United States Trustee or by final order of the Bankruptcy Court; (ii) all reasonable fees and expenses up to $5,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code; (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all fees, disbursements, costs and expenses of the Professionals incurred in an aggregate amount not to exceed $50,000. [DIP Agreement Section 1, Definitions, Carve-Out (page 2)].

h. **\* *Use of Proceeds*:** The proceeds of the Loan may be used only to the extent (a) provided for in the Budget, (b) permitted by the Loan Documents, and (c) as authorized by the Bankruptcy Court and consented to by the Lender for: (i) general working capital needs, (ii) the repayment of the Obligations and (iii) the payment of fees, expenses, and costs incurred by Lender in connection with this Ratification Agreement and the Chapter 11 Case. [DIP Agreement, Section 5.2, Use of Proceeds (page 12)].

i. ***Events of Default*:** Customary events of default including, failure to make payments when due; breach of certain covenants; breach of warranty; other defaults under Loan Documents; dissolution or cessation of business; dismissal of the bankruptcy case or conversion to a chapter 7 case; appointment of a chapter 11 trustee; appointment of an examiner with enlarged powers relating to the operation of the business of the Debtor; Financing Order reversed, stayed or rescinded or amended or supplemented by the Court without written consent of the DIP Lender; attempts by the Debtor to obtain an order of the Bankruptcy Court or other judgment, which would invalidate, reduce or otherwise impair DIP Lender's claims or claim priority status; a material deviation from the DIP Budget; failure to adhere to the sale timeline; filing of pleadings by the Debtor affecting the priority claim status of DIP Lender's claims, invalidation or subordination of the priority claim status, the confirmation of a plan which does not contain a provision for payment in full in cash of all obligations of the Debtor to DIP Lender; filing of a motion by the Debtor requesting, or entry of an order granting, any super-priority claim which is senior to the DIP Lender's claims, except as expressly provided in the Agreement. [DIP Agreement, Section 7 (pages 20-21)].

j. **\* *Grant of Security Interest*:** Substantially all of the Debtor's pre-petition and post-petition assets; provided, however, that the collateral will include causes of action under Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, only upon entry of a permanent financing order. [DIP Agreement Section 1(q) Definitions, Post-Petition Collateral (page 4)].

k. **\* *Roll-up of Pre-petition Debt:*** The Lender is permitted to apply loan payments to pre-petition debt. [DIP Agreement Section 7.4(b)(i), Payments (page 14); DIP Order Section 1.5 (page 15)]. The Debtor does not anticipate that this provision will result in any increase in the value of the Lender's collateral for Pre-petition

loans. **Priority**:  All obligations to the Lender are secured by a first priority security interest and superpriority administrative expense, subject to the Carve-Out.  [DIP Order Section 2.2 (page 19)].  The pre-petiton junior secured creditor has not separately consented to the grant of senior post-petition liens, but the but consent is contained in the prepetition Subordination Agreement between the secured lenders.* *Waiver of Section 506(c) Claims* Subject to the entry of a permanent DIP order, all claims under section 506(cc) are waived. [DIP Order Section 4.3 (page 31)].* *Marshaling of Assets:*  Subject to the entry of a permanent order, the marshaling of assets under Section 552 of the Bankruptcy Code is prohibited.  [DIP Order Section 5.9 (page 38)].*Sale Timeline:*  The Debtor is required to pursue the sale of its assets and business, with the failure to reach various milestones on time constituting an event of default, including without limitation the filing of an application to employ an investment banker on the petition date, the filing of motion to approve sale and bid procedures by February 24, 2017, and the consummation of a sale by April 3. [DIP Agreement Section 5.4 Sale Milestones (page 14)].*Remedies*:  Upon the occurrence of an Event of Default, the DIP Lender shall have customary remedies and may, upon 3 business days notice to the Debtor, any Committee and certain other parties, exercise default remedies without further order of the Bankruptcy Court. [DIP Order Section 3.4 (page 27)].

3. Material provisions of the Rosenthal DIP Agreement are set forth in the following sections of the DIP Agreement or the Permanent DIP Order.  Items marked with an asterisk* are required to be highlighted by Local Rule 4001-2(a)(i).

   a. *Borrower***:** Prestige Industries, LLC [DIP Agreement, page 3].

   b. *DIP Lender***:** Rosenthal & Rosenthal, Inc. [DIP Agreement, page 1].

   c. *DIP Facility Amount*:  A maximum amount outstanding of $5,200,000, which represents no change from the pre-petition credit facility maximum.  The Debtor's ability to borrow is limited by an availability formula. [DIP Agreement, Section 1.55 Definitions (page 7).

   d. *Fees:* The Debtor paid a pre-petition commitment fee of $52,000 and is required to pay various other fees, including without limitation a loan fee on closing of $52,000 and a termination fee of $104,000, for a total of 4% of the maximum loan amount. [DIP Agreement Section 3 Lender's Charges (page 11)].

   e. *Interest Rates***:** The non-default interest rate ranges from 6% to 9.5% and the default rate is 1.5% per month. [DIP Agreement, Section 2.4].

   f. *Final Order:*  The Lender will provide the loan only after the entry of the Final Order.  [DIP Agreement Section 13 (page 27)].

g. ***Carve-Out*:** The Lender's claims are subject to a carve-out which is defined as the sum of (i) all allowed administrative expenses pursuant to 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Bankruptcy Court and pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code as determined by agreement of the United States Trustee or by final order of the Bankruptcy Court; (ii) all reasonable fees and expenses up to $5,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code; (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order, or otherwise, all fees, disbursements, costs and expenses of the Professionals incurred in an aggregate amount not to exceed $250,000. [DIP Agreement Section 1 Definitions (page 2)].

h. **\* *Grant of Security Interest*:** Substantially all of the Debtor's pre-petition and post-petition assets; provided, however, that the collateral will include causes of action under Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code. [DIP Agreement Section 1(q) Definitions Post-Petition collateral (page 4)]. **\* *Priority*:** All obligations to the Lender are secured by a first priority security interest and superpriority administrative expense, subject to the Carve-Out. [DIP Order Section 2.2 (page 19)]. The Debtor will seek the consent of the pre-petition junior secured creditor, to the extent the junior secured creditor has not previously consented in pre-petition loan documentation.**\* *Waiver of Section 506(c) Claims*** Subject to the entry of a permanent DIP order, all claims under section 506(c) are waived. [DIP Order, Section 4.2 (page 25)].**\* *Marshaling of Assets*:** Subject to the entry of a permanent order, the marshaling of assets under Section 552 of the Bankruptcy Code is prohibited. [DIP Order Section 5.9 (page 38)]. ***Remedies*:** Upon the occurrence of an Event of Default, the DIP Lender shall have customary remedies and may, upon 5 business days notice to the Debtor, any Committee and certain other parties, exercise default remedies without further order of the Bankruptcy Court. [DIP Order Section 3.4 (page 23)].

m. ***Plan and Sale Milestones*:** The Debtor is required to adhere to a timeline for the filing and confirmation of a plan, failing which the Debtor is then required to follow a timeline for the sale of its assets. [DIP Agreement Section 8 (page 20)].

n. ***Termination Date*:** The termination date the loan agreement (which either party can trigger with notice) is February 28, 2018, subject to earlier termination upon default. [DIP Agreement Section 13 (page 27)].

## Jurisdiction

4. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.  The bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Background**

7.  On January 30, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate as debtor-in-possession and remains in possession of its assets. No official committee of unsecured creditors has been appointed.

8.  The factual background relating to the Debtor's commencement of this Chapter 11 cases is set forth in detail in the *Declaration of Jonathan Fung* (the "First Day Declaration") filed on the Petition Date and incorporated herein by reference.

9.  The Debtor, the successor to Prestige Corporation which was founded in 1995, is the largest hospitality laundry services provider in the New York City area, servicing over 90 hotels and other customers.

10. Following a period of rapid growth between 2007 and 2011, the Debtor experienced a series of operational setbacks, including cost overruns and delays in the construction of its state-of-the-art plant in North Bergen, New Jersey, weak operational management in its Patterson, New Jersey leading to high staff turnover and high temporary labor costs, and other adverse events. As a result, the Debtor is over-leveraged and has experienced persistent cash flow constraints despite maintaining operating profits before considering interest and

depreciation. The Debtor employs approximately 582 employees in its plants in North Bergen and Patterson, New Jersey and generates annual revenues of approximately $40 Million.

11. The Debtor seeks to sell its assets and business as a going concern to maximize the return to creditors.

12. The Debtor commenced this Chapter 11 case to facilitate the sale of its business and to secure continued working capital financing to enable it to continue operations through the date of a sale, which is only available as debtor in possession financing.

13. The Debtor requests that the Court authorize it to obtain secured post-petition financing, initially in the form of the continuation of its existing $5,200,000 senior secured credit facility, and subsequently in the form of a $5,200,000 replacement senior secured loan pursuant to the terms of this Motion, the relevant DIP Agreements and the requested DIP Financing Orders.

### The Temporary and Permanent DIP Loans Should Be Authorized

14. Approval of the DIP Facility will provide the Debtor with immediate and ongoing access to borrowing availability to pay its current and ongoing operating expenses, including post-petition wages, salaries, and vendor costs. Unless these expenses are paid, the Debtor will be forced to cease operations, which would likely result in irreparable harm to its business and jeopardize the Debtor's ability to reorganize and maximize value for all interested parties.

15. The credit provided under the proposed DIP Agreements will enable the Debtor to continue to service its customers, pay its vendors and employees in the ordinary course to preserve the value of the estate while the Debtor pursues the sale of its assets and business. The availability of credit under the proposed DIP Agreements will provide confidence to the Debtor's vendors and customers that will enable and encourage them to continue their relationships with the Debtor. Accordingly, the timely approval of the relief requested herein is imperative.

16. Section 364(c) and (d) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt: (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; (c) secured by a junior lien on property of the estate that is subject to a lien; or (d) secured by a lien that is equal or senior to existing liens. 11 U.S.C. § 364. The Debtors propose to obtain the financing set forth in the DIP Agreements by providing, inter alia, security interests and liens pursuant to section 364(c) and (d) of the Bankruptcy Code.

17. The Debtors' liquidity needs can be satisfied only if the Debtor is authorized to borrow under the DIP Loans and to use the proceeds to fund its operations. The Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b) or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Debtor has sought such funding from multiple sources prior to initiating these cases, none of which was willing to lend funds on an unsecured basis or on terms more favorable than the DIP Lenders.

18. Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest");

*see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

19.  The Debtor submits that the circumstances of this case require the Debtor to obtain financing pursuant to section 364(b) and, accordingly, the DIP Agreement reflects the exercise of its sound business judgment.

20.  The terms and conditions of the DIP Agreements are fair and reasonable and were negotiated extensively by well-represented parties in good faith and at arms' length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

**Basis for Cash Collateral Relief**

**A. The Debtor Requires the Use of the Cash Collateral.**

21. As set forth above, the Debtor has an urgent need for debtor-in-possession financing, which includes use of the Cash Collateral pending the final hearing on this Motion on the terms set forth in the Wells DIP Agreement. Cash Collateral in this case consists of the Lender's interests in the Collateral which supports the debtor-in-possession financing. Accordingly, the Debtor seeks to use Cash Collateral existing on or after the Petition Date that is subject to the DIP Lender's post-petition liens and the Lender's pre-petition liens and security interests on the terms set forth in the Wells DIP Agreement. As of the Petition Date, the Debtor does not have sufficient unencumbered cash to fund its business operations and pay present operating expenses.

22. Substantially all of the Debtor's assets are also subject to a security interest in favor of Medley Capital Corporation, as agent for itself and St. Cloud Capital Partners II, L.P. ("Medley")(Wells, Rosenthal, and Medley, collectively the "Secured Parties").

23. Absent the ability to obtain debtor-in-possession financing and use Cash Collateral, the Debtor will not be able to pay insurance, wages, rent, utility charges, and other critical operating expenses. Consequently, without access to Cash Collateral, the Debtor will not be able to maintain their business operations and continue their restructuring efforts, and would likely be forced to cease operations and liquidate. As such, the Debtor's estate would be immediately and irreparably harmed.

24. If the Debtor is unable to obtain sufficient operating liquidity to meet its post-petition obligations on a timely basis, a permanent and irreplaceable loss of business will occur, causing a loss of value to the detriment of the Debtor and its creditors. This potential loss of revenue and going concern value would be extremely harmful to the Debtor, its estate and its

creditors at this critical juncture. The Debtor cannot obtain funds sufficient to administer it estate and operate its business other than by obtaining the relief requested herein pursuant to section 363 of the Bankruptcy Code.

25.     The Debtor's management has formulated the Budget for the use of debtor-in-possession financing and Cash Collateral. The Debtor believes that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of their businesses and their restructuring efforts for the period set forth in the Budget. The Debtor also believes that the use of Cash Collateral in accordance with the Budget will provide the Debtor with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

26.     The Debtor's right to use Cash Collateral on the terms set forth in the DIP Agreements, as approved by the Interim Order shall commence on the date of the entry of the Interim Order and expire on the earlier of (a) the entry of a subsequent interim order, or (b) the entry of the Final Order.

**B.  The Interests of the Secured Parties Are Adequately Protected.**

27.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may only use "cash collateral" with the consent of the secured party with an interest therein or court approval. *See* 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in cash collateral sought to be used by a debtor, the court shall prohibit or condition such use of cash collateral as is necessary to provide adequate protection of such entity's interest. See 11 U.S.C. § 363(e).

28.     Appropriate adequate protection is decided on a case-by-case basis. *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Beker Indus. Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re*

*JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case) (citing *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987). Although adequate protection is not defined in the Bankruptcy Code, section 361 of the Bankruptcy Code provides the following three (3) nonexclusive examples of what may constitute adequate protection:

> (1)    requiring the [debtor] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 . . . results in a decrease in the value of such entity's interest in such property;
>
> (2)    providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or
>
> (3)    granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. Essentially, with the provision of adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *see also In re Nice*, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a Debtor's continued use of collateral"). The Debtor asserts that the Lenders are adequately protected by the granting of replacement liens as set forth in the Ratification and Amendment Agreement, and the continuation of the Debtor's business.

<u>*Replacement Liens*</u>

29.    As adequate protection for any diminution in value of the Secured Parties' collateral, the Debtor requests that the Court grant the Lenders security

13

equivalent to a lien granted under section 364(c)(2) and (3) and 364(d) of the Bankruptcy Code in and upon the Debtor's property and the Cash Collateral, whether such property was acquired before or after the Petition Date, to the extent provided in the Wells DIP Agreement.

30. As adequate protection for any diminution in value of Medley's interests, the Debtor requests that the Court grant Medley security equivalent to a lien granted under section 364(c)(2) and (3) of the Bankruptcy Code in and upon the Debtor's property and the Cash Collateral, whether such property was acquired before or after the Petition Date, which liens shall be junior and subordinate to the liens of the DIP Lenders. The liens proposed to be granted in this paragraph and the foregoing paragraph are referred to collectively as the "Replacement Liens."

31. The Debtor notes that Medley and Wells are parties to a subordination agreement which, among other things, prohibits Medley from objecting to the use of cash collateral or requesting any related relief other than the granting of replacement liens, as proposed by this Motion.

*Continued Operation of the Debtor's Business*

32. In addition to the proposed Replacement Liens, the Lenders are also adequately protected as a result of the continuation of the Debtor's business operations. Without the use of the Cash Collateral, the Debtor would forego business opportunities and their operations would be irreparably harmed. Indeed, absent use of the Cash Collateral, the Debtor will be unable to pay its ordinary business expenses, including employee wages. In that event, all operations will cease, employees will be terminated, and all assets on which the Lenders assert a lien will be liquidated. Those pledged assets will be worth less in a liquidation than they will be worth as a going concern reorganization. Since the Debtor has generated positive EBITDA in the past and project positive EBITDA for the future, use of cash collateral to operate the business and

maintain going concern value provides adequate protection to the Lenders. As going concern value exceeds liquidation value, adequate protection is being provided.

33.     The continuation of the Debtor's operations likely presents the best opportunity for the Lenders to receive the greatest recovery on account of their respective claims. Accordingly, the Debtor submits that use of the Cash Collateral will allow the Debtor to continue their operations and, thereby, protect the Lenders' interests. Courts have recognized that the preservation of the going concern value of secured lender's collateral constitutes adequate protection of such creditor's interest in the collateral. *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re 499 W. Warren Street Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (where the court found a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditor's secured position would be enhanced by the continued operation of the Debtor's business); *In re Aqua Assocs.*, 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

34.     The Debtor anticipates the prompt sale of its assets and business as a going concern. In that regard the Debtor engaged SSG Capital Advisors to assist with that process and, based in part upon the reaction of the market to date, the Debtor is highly optimistic of successfully concluding a going concern sale, which would yield substantially more than any liquidation scenario.

35. The Debtor submits that the Secured Parties are adequately protected by the proposed Replacement Liens in the Debtor's property and by maintaining the business of the Debtor as a going concern and thereby preventing any diminution in the value of the pre-petition collateral.

### The Automatic Stay Should Be Modified on a Limited Basis

36. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to: (i) grant the security interests, liens and claims described above with respect to the DIP Lenders and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) implement the terms of the proposed Interim and Final Orders; and (iii) provide the relief required by the DIP Agreements.

37. Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

38. The Debtor submits that the Lenders are adequately protected by the proposed Replacement Liens in the Collateral and by maintaining the business of the Debtor as a going concern and thereby preventing any diminution in the value of the Prepetition Collateral.

### Interim Approval Should Be Granted

39. The Debtor respectfully requests that the Court conduct an expedited preliminary hearing on this Motion and authorize the Debtor (from and after the entry of the Interim Order and pending the final hearing) to obtain debtor-in-possession financing on the terms set forth in the Wells Credit Agreement and use of the Cash Collateral in accordance with the Budget for, among other things, working capital purposes and the payment of certain obligations in accordance with the relief authorized by the Court. Interim access to the debtor-in-possession

16

119431097_4

financing and Cash Collateral will ensure that the Debtor maintain ongoing operations and avoid immediate and irreparable harm and prejudice to its estate and all parties in interest pending the Final Hearing on this Motion.

40. The Debtor submits that, for the reasons set forth herein, immediate access to the debtor-in-possession financing and use of Cash Collateral (first, on an interim basis as requested in this Motion) on the terms set forth in the Budget, is necessary to preserve the value of the Debtor's estate for its benefit of all parties in interest.

### Request for Final Hearing

41. Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than twenty-one (21) days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

42. To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 7062, 9014, or Local Rule 9013-1(b).

### Notice

43. This Motion has been served upon (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for secured creditors believed to be claiming an interest in cash collateral; (c) the Internal Revenue Service; (d) the twenty (20) largest unsecured creditors; (e) counsel to Rosenthal; and (f) other parties as set forth in the accompanying Certificate of Service. In light of the nature of the relief requested, the Debtor respectfully submits that no further notice is necessary.

44. WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**; and grant such other and further relief as is just and proper.

Dated:  January 30, 2017

/s/ Peter C. Hughes
**DILWORTH PAXSON LLP**
Peter C. Hughes (I.D. No. 4180)
One Customs House – Suite 500
704 King Street
P.O. Box 1031
Wilmington, DE 19801
Telephone: (302) 571-9800
Facsimile: (302) 571-8875

-and-

**DILWORTH PAXSON LLP**

James M. Matour (*pro hac vice admission pending*)
Peter C. Hughes
Erik L. Coccia (*pro hac vice admission pending*)
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200

*Proposed Counsel for the Debtor and Debtor in Possession*