**<u>EXHIBIT D</u>**
[Rosenthal DIP Agreement]

119431097_4

# Rosenthal & Rosenthal, Inc.

## Senior Secured Debtor-In-Possession Financing Agreement

SENIOR SECURED DEBTOR-IN-POSSESSION FINANCING AGREEMENT (this "**Agreement**"), is entered into as of February ___, 2017 between Prestige Industries LLC ("**Borrower**"), a limited liability company duly organized and presently existing in good standing under the laws of the State of Delaware whose chief executive office is at 1099 Wall Street West, Suite 100, Lyndhurst, NJ 07071, as Debtor and Debtor-in-Possession, and ROSENTHAL & ROSENTHAL, INC. ("**Lender**"), a New York corporation with an address at 1370 Broadway, New York NY 10018.

Borrower desires to obtain loans and other financial accommodations from Lender on a revolving basis upon the security of the Collateral (as herein defined). Now, therefore, Borrower and Lender agree as follows.

## 1.  DEFINITIONS

As used in this Agreement, these terms shall have the following meanings which shall be applicable to both the singular and plural forms of such terms.

1.1.  **"Acceptable Reorganization Plan"** means a chapter 11 plan or plans filed in the Chapter 11 Case that provides for the payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable) on the effective date of such chapter 11 plan and otherwise acceptable to Lender.

1.2.  **"Account Debtor"** shall mean the account debtor with respect to a Receivable and any other person who is obligated on such Receivable.

1.3.  **"Accounts"** shall mean accounts as defined in Article 9 of the UCC.

1.4.  **"Affiliate"** of a party shall mean any entity controlling, controlled by, or under common control with, the party, and the term "controlling" and such variations thereof shall mean ownership of a majority of the voting power of a party.

1.5.  **"Auction"** shall have the meaning provided in Section 8.4 hereof.

1.6.  **"Bankruptcy Code"** shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

1.7.  **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the _____.

1.8.  **"Bid Procedures Order"** shall have the meaning provided in Section 8.3 hereof.

1.9.  "Blocked Account" shall have the meaning provided in Section 5.1 hereof.

1.10.  **"Blocked Person"** shall have the meaning provided in Section 6.16 hereof.

1.11.  **"Budget"** shall mean the budget to be delivered to Lender in accordance with Section 7 hereof, in form and substance satisfactory to Lender together with any subsequent or amended budget(s) thereto delivered to Lender, in form and substance satisfactory to Lender, in accordance with the terms and conditions hereof.

1.12.  **"Budget Compliance Report"** shall have the meaning provided in Section 7.2 hereof.

1.13.  **"Business Day"** shall mean a day on which Lender and major banks in New York City are open for the regular transaction of business.

1.14.  **"Consultant"** shall have the meaning provided in Section 9.1 hereof.

1.15.  **"CFO"** shall have the meaning provided in Section 6.7 hereof.

1.16.   **"Chapter 11 Case"** shall mean the Chapter 11 case of Borrower under the Bankruptcy Code and is pending in the Bankruptcy Court as Case No. 17-_____ (___).

1.17.   **"Chattel Paper"** shall mean chattel paper as defined in Article 9 of the UCC.

1.18.   **"Closing Date"** shall mean the date set forth in the first paragraph of this Agreement.

1.19.   **"Collateral"** shall mean, collectively, all now existing and hereafter acquired real and personal property of Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Lender, pursuant to the Loan Documents, or any order entered or issued by the Bankruptcy Court, and shall include, without limitation:

    (i)     all of Debtor's Accounts;

    (ii)    all of Debtor's books and records;

    (iii)   all of Debtor's Chattel Paper;

    (iv)   all of Debtor's Commercial Tort Claims;

    (v)    all of Debtor's Deposit Accounts;

    (vi)   all of Debtor's Equipment;

    (vii)   all of Debtor's Farm Products;

   (viii)   all of Debtor's Fixtures;

    (ix)   all of Debtor's General Intangibles;

    (x)    all of Debtor's Inventory;

    (xi)   all of Debtor's Investment Property;

    (xii)   all of Debtor's Intellectual Property and intellectual property licenses;

   (xiii)   all of Debtor's negotiable collateral;

   (xiv)   all of Debtor's pledged ownership interests;

    (xv)   all of Debtor's Securities Accounts;

   (xvi)   all of Debtor's Supporting Obligations;

   (xvii)   all of Debtor's money, cash equivalents, or other assets of Debtor that now or hereafter come into the possession, custody, or control of Lender (or its agent or designee);

  (xviii)   all of the proceeds (as such term is defined in the UCC) and products, whether tangible or intangible, of any of the foregoing, including, without limitation, proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, books and records, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, negotiable collateral, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect to the Intellectual Property included in the Collateral, including payments under all licenses entered into in connection therewith

and damages and payments for past, present, or future infringements thereof, and the right to sue for past, present, and future infringements of the Intellectual Property included in the Collateral, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the **"Proceeds"**).  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to Debtor or Lender from time to time with respect to any of the Investment Property;

(xix)   from and after the entry of the Permanent Financing Order, all claims, rights, interests, assets and properties recovered by or on behalf of Debtor or any trustee of Debtor (whether in the Chapter 11 Case or any subsequent case to which the Chapter 11 Case is converted) including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Section 544, 545,547, 548, 549,550, 551, and 553 of the Bankruptcy Code; and

(xx)   to the extent not otherwise described above, all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(xxi)   to the extent not otherwise described above, all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (1) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (2) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (3) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (4) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(xxii)   to the extent not otherwise described above, all (1) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (2) monies, credit balances, deposits and other property of Debtor now or hereafter held or received by or in transit to Lender or its Affiliates or at any other depository or other institution from or for the account of Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xxiii)   to the extent not otherwise described above to the extent not otherwise described above, all Receivables, whether or not Eligible Receivables and whether or not specifically listed on any schedules, assignments or reports furnished to Lender;

(xxiv)   to the extent not otherwise described above to the extent not otherwise described above, all accounts, instruments, chattel paper, documents, general intangibles, deposit accounts, investment property and letter of credit rights, whether or not arising out of the sale of goods or rendition of services, and including choses in action, causes of action, tax refunds (and claims), and reversions from terminated pension plans;

(xxv)   to the extent not otherwise described above all of Debtor's books and records; and

3

(xxvi)    to the extent not otherwise described above, all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral; _provided_, that notwithstanding anything to the contrary contained herein, in no event shall Collateral include, or Lender's lien attach to (A) Hazardous Materials, or (B) any of the outstanding Ownership Interests of a Foreign Subsidiary in excess of 65% of the issued and outstanding Ownership Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Ownership Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956(e)(2)) in each Foreign Subsidiary if the pledge of a greater percentage would result in adverse tax consequences to Borrower or would reasonably be expected to result in adverse tax consequences to Borrower in the future), or (C) any Receivables of Borrower, any document, contract, license or agreement to which Borrower is a party or any of its rights or interests thereunder (including rights of Borrower in any assets leased, licensed or otherwise acquired thereunder), if and for so long as the grant of such security interest or the assignment thereof shall constitute or result in a breach or right of termination in favor of any party pursuant to the terms of, or a default under, or is otherwise prohibited by the terms of any such document, contract, license or agreement due to an enforceable provision containing a restriction on assignment, transfer, pledge, hypothecation or the grant of a security interest thereunder (other than to the extent that any such term is rendered ineffective pursuant to Section 9406, 9407, 9408, or 9409 of the UCC (or any successor provision or provisions) or any other applicable law (including the Bankruptcy Code) or principles of equity); provided that the foregoing exclusion shall not apply if such prohibition has been waived by the other party to such document, contract, license or agreement or the other party to such document, contract, license or agreement has otherwise consented to the creation hereunder of a security interest in such document, contract, license or agreement; provided, further, that immediately upon the ineffectiveness or lapse or termination of any such provision, the Collateral shall include, and Borrower shall be deemed to have granted a security interest in, all its rights, title and interests in and to such document, contract, license or agreement as if such provision had never been in effect; and provided, further, that the foregoing exclusion shall in no way be construed so as to limit, impair or otherwise affect Lender's unconditional continuing security interest in and to all rights, title and interests of Borrower in or to any payment obligations or other rights to receive monies due or to become due under any such document, contract, license or agreement and in any such monies and other proceeds of such document, contract, license or agreement, or (D) any "intent to use" trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such "intent to use" trademark applications under applicable federal law.

1.20.   **"Collateral Documents"** shall mean any and all security agreements, deposit account control agreements, mortgages and other documents executed and delivered to Lender to secure the Obligations.

1.21.   **"Commercial Tort Claims"** shall mean commercial tort claims as defined in Article 9 of the UCC.

1.22.   **"Copyrights"** means, with respect to any Person, all of such Person's right, title, and interest in and to the following: (a) all copyrights, rights and interests in copyrights, works protectable by copyright, copyright registrations, and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the

foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing throughout the world.

1.23.    **"Current Assets"** shall mean, at a particular date, all amounts which would, in conformity with GAAP, be included under current assets on a balance sheet of Borrower, as at such date, including but not limited to (i) cash, (ii) accounts, (iii) inventory; and (iv) prepaid current assets of Borrower providing however, that such amounts shall not include any amounts for any indebtedness owing by any Affiliate to Borrower.

1.24.    **"Current Liabilities"** shall mean, at a particular date, all amounts which would, in conformity with GAAP, be included under current liabilities on a balance sheet of Borrower, as at such date, but in any event including, without duplications, the amounts of (a) all post-petition indebtedness payable on demand, or at the option of the person or entity to whom such indebtedness is owed, not more than twelve (12) months after such date, (b) any payments in respect of any post-petition indebtedness (whether installment, serial maturity, sinking fund payment or otherwise) required to be made not more than twelve (12) months after such date, (c) all reserves in respect of post-petition liabilities or indebtedness payable on demand or, at the option of the person or entity to whom such indebtedness is owed, not more than twelve (12) months after such date, the validity which is not contested to such date, (d) all accruals for post-petition federal or other taxes measured by income payable within twelve (12) months of such date and (e) all outstanding indebtedness to Lender.

1.25.    **"Debtor"** shall mean Borrower, as Debtor and Debtor-in-Possession in the Chapter 11 Case. All references to Debtor, including, without limitation, to the terms "Borrower," "Prestige" and "Company" in this Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean and include the Debtor as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

1.26.    **"Default"** shall have the meaning provided in Section 12.1 hereof.

1.27.    **"Deposit Accounts"** shall mean deposit accounts as defined in Article 9 of the UCC.

1.28.    **"Domestic Subsidiary"** shall mean any direct or indirect Subsidiary of Borrower organized under the laws of any state of the United States or the District of Columbia.

1.29.    **"Effective Rate"** shall have the meaning provided in Section 3.1 hereof.

1.30.    **"Eligible Receivables"** shall mean Receivables created by Borrower in the ordinary course of its business which have been validly assigned to Lender and in which Lender holds a perfected security interest pursuant to the terms hereof ranking prior to and free and clear of all interests, claims, and rights of others and which are and at all times shall continue to be acceptable to Lender in all other respects. Standards of eligibility may be fixed and revised from time to time solely by Lender in its exclusive judgment. In determining eligibility Lender may, but need not, rely on ageings, reports and schedules of Receivables furnished by Borrower, but reliance thereon by Lender from time to time shall not be deemed to limit Lender's right to revise standards of eligibility at any time. In general, a Receivable shall not be deemed eligible unless the Receivable complies with the Minimum Receivable Eligibility Requirements and the Account Debtor on such Receivable is and at all times continues to be acceptable to Lender and unless each Receivable complies in all respects with the representations, covenants and warranties hereinafter set forth and meets all standards imposed by any governmental agency or authority.

1.31.   **"Environmental Laws"** shall mean all federal, state or local environmental codes, ordinances, rules and regulations.

1.32.   **"Equipment"** shall mean equipment as defined in Article 9 of the UCC.

1.33.   **"ERISA"** shall mean the Employee Retirement Income Security Act.

1.34.   **"Farm Products"** shall mean farm products as defined in Article 9 of the UCC.

1.35.   **"Fee Letter"** shall mean that certain $5,200,000 Senior Secured Debtor-In-Possession Financing Facility Commitment Fee Letter dated January __, 2017 by and between Lender and Prestige Industries, Inc., as may be amended, restated, renewed, supplemented or otherwise modified from time to time.

1.36.   **"Financing Order"** means the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Lender to Borrower on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

1.37.   **"Fixtures"** shall mean fixtures as defined in Article 9 of the UCC.

1.38.   **"Foreign Subsidiary"** shall mean any direct or indirect Subsidiary that is not a Domestic Subsidiary.

1.39.   **"GAAP"** shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the elements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied.

1.40.   **"General Intangibles"** shall mean general intangibles as defined in Article 9 of the UCC.

1.41.   **"Hazardous Materials"** shall mean all or any of the following: (a) substances that are defined or listed in or otherwise classified pursuant to, any Environmental Laws as hazardous substances, hazardous materials, hazardous wastes, toxic substances or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosively, radioactivity, carcinogenicity, reproductive toxicity, or EP toxicity or are otherwise regulated for the protection of persons, property or the environment; (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources; (c) any flammable substances or explosives or any radioactive materials; and (d) asbestos in any form or electrical equipment which contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million.

1.42.   **"Independent Manager"** shall have the meaning provided in Section 6.18 hereof.

1.43.   **"Intellectual Property"** means, collectively, with respect to any Person, such Person's Trademarks, Patents and Copyrights.

1.44.   **"Inventory"** shall mean inventory as defined in Article 9 of the UCC.

1.45.   **"Inventory Availability"** shall have the meaning given in Section 2.1 hereof.

1.46.   **"Investment Banker"** shall have the meaning provided in Section 8.2 hereof.

1.47.   **"Investment Property"** shall mean investment property as defined in Article 9 of the UCC.

1.48.   **"Lease"** and **"Leased Premises"** shall have the meanings given in Section 12.1 hereof.

6

1.49.   **"Loan Account"** shall mean the Loan Account as described in Section 2.2 hereof.

1.50.   **"Loan Availability"** shall have the meaning given in Section 2.1 hereof.

1.51.   **"Loan Documents"** shall mean, collectively, this Agreement, the Collateral Documents, and each guaranty, certificate, agreement, or document executed by Borrower or any of its guarantors and delivered to Lender in connection with the foregoing.

1.52.   **"Margin"** shall mean 2.5% per annum.

1.53.   **"Material Adverse Effect"** shall mean a material adverse effect on (i) the business, assets, financial condition or results of operations of Borrower and its subsidiaries taken as a whole; (ii) the ability of Borrower to perform its obligations under the Loan Documents to which it is a party, (iii) the validity or enforceability of the Loan Documents, or the rights or remedies of the Lender hereunder, (iv) the value of the Collateral, or (v) the priority of the Lender's liens on the Collateral.

1.54.   **"Material Budget Deviation"** shall have the meaning provided in Section 7.4 hereof.

1.55.   **"Maximum Credit Facility"** shall mean $5,200,000.

1.56.   **"Maximum Rate"** shall have the meaning provided in Section 13.2 hereof.

1.57.   **"Milestone Default"** shall have the meaning provided in Section 8.2 hereof.

1.58.   **"Minimum Receivable Eligibility Requirements"** shall have the meaning given in Section 2.3 hereof.

1.59.   **"Net Amount of Eligible Receivables"** shall mean the gross amount of Eligible Receivables less sales, excise or similar taxes, returns, discounts, claims, credits and allowances of any nature at any time issued, owing, granted, outstanding or claimed, and less (without duplication) all amounts payable by any Account Debtor on Eligible Receivables of such Account Debtor that are unpaid more than 90 days following its invoice date.

1.60.   **"Obligations"** shall mean all obligations, liabilities and indebtedness of Borrower to Lender or an Affiliate of Lender, however evidenced, arising under this Agreement, any other Loan Document (whether by reason of extension of credit, guaranty, indemnity or otherwise), or under any other or supplemental financing provided to Borrower by Lender or an Affiliate of Lender, or independent hereof or thereof, whether now existing or incurred from time to time hereafter and whether before or after termination hereof, absolute or contingent, joint or several, matured or unmatured, direct or indirect, primary or secondary, liquidated or unliquidated, and whether arising directly or acquired from others (whether acquired outright, by assignment unconditionally or as collateral security from another and including participations or interest of Lender in obligations of Borrower to others), and including (without limitation) all of Lender's charges, commissions, fees, interest, expenses, costs and attorneys' fees chargeable to Borrower in connection therewith.

1.61.   **"Overadvance"** shall mean any portion of all loans and advances which on any day exceeds the Loan Availability.

1.62.   **"Ownership Interests"** shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), and any and all warrants or options to purchase any of the foregoing.

1.63.   **"Patents"** means, with respect to any Person, all of such Person's right, title, and interest in and to: (a) any and all patents and patent applications; (b) all inventions and improvements described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, and continuations-in-part

thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing throughout the world.

1.64. **"Permanent Financing Order"** means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing of the Bankruptcy Court, which order shall be in form and substance satisfactory to the Lender in its sole discretion and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, consented to by the Lender, which among other matters, but not by way of limitation, authorizing the Borrower to obtain credit, incur the Obligations, and grant Liens therefor and granting super-priority expense claims to Lender with respect to all obligations due Lender, subject to no priority claim or administrative expenses of the Chapter 11 Case or any other entity (other than as specifically set forth in the Financing Order).

1.65. **"Permitted Liens"** means the liens of Lender granted under the Loan Documents and any other liens, if any, described on the attached Exhibit A.

1.66. **"Permitted Overadvances"** shall have the meaning set forth in Section 2.4 hereof.

1.67. **"Permitted Overadvance Amount"** shall have the meaning set forth in Section 2.4 hereof.

1.68. **"Person"** shall mean any person, firm, corporation, partnership, limited liability company, association, company, trust, estate, custodian, nominee or other individual or entity.

1.69. **"Petition Date"** shall mean the date of the commencement of the Chapter 11 Case.

1.70. **"Prime Rate"** shall mean the prime rate from time to time publicly announced in New York City by JPMorgan Chase Bank.

1.71. **"Receivables"** shall mean all obligations to Borrower for the payment of money arising out of the rendering of services or sale of goods by Borrower, now existing or hereafter arising, however evidenced, including all accounts, contract rights, general intangibles, documents, chattel paper and instruments (as each of such terms is defined in the UCC).

1.72. **"Receivable Availability"** shall have the meaning specified in Section 2.1 hereof.

1.73. **"Sale"** shall have the meaning provided in Section 8.3 hereof.

1.74. **"Sale Order"** shall have the meaning provided in Section 8.5 hereof.

1.75. **"Securities Accounts"** shall mean securities accounts as defined in Article 8 of the UCC.

1.76. **"Subordinated Debt"** means indebtedness of Borrower, the repayment of which is subordinate to the Obligations on terms and conditions acceptable to Lender.

1.77. **"Subordinated Creditor"** means any party to whom Subordinated Debt is owed by Borrower.

1.78. **"Subsidiary"** shall mean any corporation, limited liability company, partnership, trust or other entity (whether now existing or hereafter organized or acquired) of which Borrower or one or more subsidiaries of Borrower at the time owns or controls directly or indirectly more than 50% of the shares of stock or partnership or other ownership interest having general voting power under ordinary circumstances to elect a majority of the board of directors, managers or trustees or otherwise exercising control of such corporation, limited liability company, partnership, trust or other entity (irrespective of whether at the time stock or any other form of ownership of any class or classes shall have or might have voting power by reason of the happening of any contingency). Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of the Borrower.

1.79.   **"Supporting Obligations"** shall mean supporting obligations as defined in Article 9 of the UCC.

1.80.   **"Tangible Net Worth"** shall mean, at a particular date (a) the aggregate amount of all assets of Borrower as may be properly classified as such in accordance with GAAP consistently applied excluding such other assets as are properly classified as intangible assets under GAAP, less (b) the aggregate amount of all liabilities of Borrower (excluding subordinated liabilities to Lender) determined in accordance with GAAP.

1.81.   **"Trademarks"** means, with respect to any Person, all of such Person's right, title, and interest in and to the following: (a) all trademarks (including service marks), trade names, trade dress, and trade styles and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all licenses of the foregoing, whether as licensee or licensor; (c) all renewals of the foregoing; (d) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (f) all rights corresponding to any of the foregoing throughout the world.

1.82.   **"Working Capital"** shall mean the excess, if any, of Current Assets less Current Liabilities.

1.83.   **"UCC"** shall mean the Uniform Commercial Code as in effect from time to time in the State of New York, provided, however, that in the event by reason of mandatory provisions of law, any of the attachment, perfection, or priority of Lender's security interest in any of the Collateral is governed by the Uniform Commercial Code as in effect in any jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

## 2.   LOANS; ELIGIBILITY OF RECEIVABLES

2.1.     Lender shall, in its discretion, make loans to Borrower from time to time, at Borrower's request, which loans in the aggregate shall not exceed the lesser of (A) the Maximum Credit Facility; or (B) the Loan Availability, which means the (i) Receivable Availability which means up to eighty-five percent (85%) of the Net Amount of Eligible Receivables, plus (ii) 100% of the cash collateral, up to $1,200,000, pledged in favor of Lender by St. Cloud Capital Partners II, L.P., which cash collateral shall at all times be under the control of Lender and subject to documentation satisfactory to Lender in its sole discretion, plus (iii) the Permitted Overadvances, minus such reserves as Lender may deem, in its sole discretion, to be necessary from time to time, including, without limitation, reserves to reflect   the Professional Fee Carve Out and the other Carve Out Expenses (as each term is defined in the Financing Order).

2.2.     The making of any loan in excess of the percentages set forth above shall not be deemed to modify such percentages or create any obligation to make any further such loan. All loans (and all other amounts chargeable to Borrower under this Agreement or any supplement hereto) shall be charged to a Loan Account in Borrower's name on Lender's books. Lender shall render to Borrower each month a statement of the Loan Account (and all credits and charges thereto) which shall be considered correct and accepted by Borrower and conclusively binding upon Borrower as an account stated except to the extent that Lender receives a written notice by registered mail of Borrower's exceptions within 30 days after such statement has been rendered to Borrower.

2.3.    A Receivable meets the Minimum Receivable Eligibility Requirements if 1.) the Receivable arose from bona fide completed transactions and has not remained unpaid for more than the number of days after the invoice date set forth in Section 8; 2.) the amount of the Receivable reported to Lender is absolutely owing to Borrower and payment is not conditional or contingent, (such as consignments, guaranteed sales or right of return or other similar terms); 3.) the Account Debtor's chief executive office or principal place of business is located in the United States; 4.) the Receivable did not arise from progress billings, retainages or bill and hold sales; 5.) there are no contra relationships, setoffs, counterclaims or disputes existing with respect thereto and there are no other facts existing or threatened which would impair or delay the collectibility of all or any portion thereof; 6.) the goods giving rise thereto were not at the time of the sale subject to any liens except those permitted in this Agreement; 7.) the Account Debtor is not an Affiliate of Borrower; 8.)  there has been compliance with the Assignment of Claims Act or similar State or local law, if applicable, if the Account Debtor is the United States or any domestic governmental unit; 9.) Borrower has delivered to Lender such documents as Lender may have requested pursuant to Section 4.2 hereof in connection with such Receivable and Lender shall have received verifications of such Receivable, satisfactory to it, if sent to the Account Debtor or any other obligors or any bailees; 10.) there are no facts existing or threatened which might result in any adverse change in the Account Debtor's financial condition; 11.) not more than 50% of the Receivables of the Account Debtor or its Affiliates owed to Borrower are more than 90 days past their invoice date; 12.) the total indebtedness to Borrower of the Account Debtor does not exceed the amount of any customer credit limits as established from time to time on notice to Borrower; 13.) the Account Debtor is deemed creditworthy at all times by Lender; and 14.) all representations and warranties in this Agreement or any other Loan Document with respect to such Receivable are true and correct.

2.4.    Provided no Event of Default has occurred, Borrowers may request advances from Lender in excess of the formula advances set forth herein.  Lender may, in its sole discretion, make such advances (hereinafter called **"Permitted Overadvances"**), but in no event shall the aggregate outstanding amount of such Permitted Overadvances exceed two million dollars ($2,000,000) (the **"Permitted Overadvance Amount"**) at any time.  Upon the occurrence of an Event of Default, all Permitted Overadvances shall be immediately due and payable to Lender without notice or demand, which Borrower hereby waives. Nothing herein shall limit or restrict Lender's right to adjust the advance formulas upward or downward based upon Lender's lending criteria which is established in its sole discretion and on its own collateral evaluations.

## 3.  LENDER'S CHARGES

3.1.    Borrower agrees to pay to Lender each month interest (computed on the basis of the actual number of days elapsed over a year of 360 days) on that portion of the average daily balances in the Loan Account during the preceding month that (a) does not exceed the Receivable Availability, at a rate per annum (the **"Effective Rate"**) equal to the Prime Rate plus the Margin (b) exceeds the Receivable Availability but does not exceed the Loan Availability (including, without limitation, all Permitted Overadvances), at a rate per annum equal to the Effective Rate plus 0.5%, and (c) exceeds the Loan Availability at a rate per annum equal to the Effective Rate plus 3.5%. Any change in the effective interest rates due to a change in the Prime Rate shall take effect on the date of such change in the Prime Rate provided, that, with respect to Lender's charges, no decrease in the Prime Rate below 3.75% per annum shall be given any effect.

3.2.    Borrower shall pay to Lender a facility fee payable on the Closing Date in the amount of 1% of the Maximum Credit Facility and on the anniversary of such date in each succeeding year, in the amount of 1% of the Maximum Credit Facility.

3.3.    Borrower shall pay to Lender monthly an administration fee of $1,000 payable in arrears on the first day of each month with respect to the prior month for the stated term of this Agreement.

3.4.    Should Lender open letters of credit or issue guaranties for Borrower's account, Lender shall receive a commission equal to the greater of (a) $100 or (b) 0.25% of the face amount of such letters of credit plus an additional 0.125% for each 30 days or portion thereof that the letter of credit (or any resulting acceptances) remains open and unpaid plus preparation fees, amendment fees and bank charges.

3.5.    A statement of all of Lender's charges shall accompany each monthly statement of the Loan Account and such charges shall be payable by Borrower within 5 days after receipt of such statement. In lieu of the separate payment of charges, Lender at its option, shall have the right to debit the amount of such charges to Borrower's Loan Account, which charges shall be deemed to be first paid by amounts subsequently credited to the Loan Account. Borrower agrees that the minimum charges payable by Borrower to Lender each month under Section 3.1 hereof shall be $3,500. As more fully provided in Section 13.2 hereof, in no event shall the interest charges hereunder exceed the Maximum Rate.

## 4.    SECURITY INTEREST IN COLLATERAL

4.1.    As security for the prompt performance, observance and payment in full of all of the Obligations, Borrower grants to Lender a security interest in, a continuing lien upon and a right of setoff against, and Borrower hereby assigns, transfers, pledges and sets over to Lender the Collateral.

4.2.    At Lender's request, Borrower will provide Lender with confirmatory assignment schedules in form satisfactory to Lender, copies of customers' invoices, evidence of performance of services, or delivery of goods, and such further information as Lender may require. Borrower will take any and all steps and observe such formalities as Lender may request from time to time to create and maintain in Lender's favor a valid and first lien upon, security interest in and pledge of all of Borrower's Receivables and all other Collateral, including executing all documents that may be requested by Lender to maintain such security interest in and pledge of the Collateral. Borrower hereby authorizes Lender to file any Financing Statements under the UCC, and renewals and amendments thereof, naming Borrower as debtor, that are necessary to perfect and maintain the perfection of Lender's security interest in the Collateral.  Borrower agrees to take all steps necessary to allow Lender to comply with any Federal or state statute, which, in Lender's judgment,  if not complied with,  might afford to any Person an interest in the Collateral that would be superior to Lender's security interest in the Collateral.

## 5.    CUSTODY AND INSPECTION OF COLLATERAL AND RECORDS;
## COLLECTION AND HANDLING OF COLLATERAL

5.1.    Borrower shall, on the day received, deposit all payments on Receivables to a blocked deposit account subject to a control agreement in favor of Lender and maintained at Borrower's expense (the "**Blocked Account**").  All monies received in the Blocked Account shall be Lender's property and held in trust for Lender. As to all moneys so collected, including all prepayments by customers, such monies shall be swept to an account designated in writing by Lender at the expense of Borrower on the day received. All amounts collected on Receivables when received by Lender in such account designated by Lender shall be credited to Borrower's Loan Account, adding 1 Business Days for collection and clearance of remittances sent by wire transfer and 3 Business Days for collection and clearance of all other remittances. Such credits shall be conditional upon final payment to Lender. Nothing contained in

this Section 5.1, or otherwise in this Agreement, shall be deemed to limit Lender's rights and powers pursuant to Section 10 of this Agreement.

5.2.    All records, ledger sheets, correspondence, contracts, documentation and computer hardware and software and media relating to or evidencing Receivables or containing information relating to the Receivables shall, until delivered to Lender or removed by Lender from Borrower's premises, be kept on Borrower's premises, without cost to Lender, in appropriate containers in safe places. Lender shall at all reasonable times have full access to and the right to examine and make copies of Borrower's books and records, and shall have full access to Borrower's computer information systems, to confirm and verify all Receivables assigned to Lender and to do whatever else Lender deems necessary to protect its interest. Lender may at any time remove from Borrower's premises, or require Borrower to deliver any contracts, documentation, files and records relating to Receivables, and any computer hardware, software and media containing information relating to the Receivables or Lender may, without cost or expense to Lender, use such of Borrower's personnel, supplies, computer information systems and space at Borrower's places of business as may be reasonably necessary for collection of Receivables.

5.3.    Borrower will immediately upon obtaining knowledge thereof report to Lender all Account Debtor claims and any other matter affecting the value, enforceability or collectability of Receivables. All claims and disputes relating to Receivables are to be promptly adjusted by Borrower within a reasonable time, at its own cost and expense. Lender may, at its option, settle, adjust or compromise claims and disputes relating to Receivables which are not adjusted by Borrower within a reasonable time.  Following the occurrence of a Default, Lender may, at its option, revoke Borrower's authority to settle or adjust disputes or to further communicate with Account Debtors.

5.4    Borrower shall reimburse Lender on demand for all costs of collection incurred by Lender in efforts to enforce payment of Receivables, recovery of or realization upon any other Collateral, including attorneys' fees and the fees and commissions of collection agencies. All and any fees, costs and expenses, of whatever kind and nature, including taxes of any kind, which Lender may incur in filing public notices, obtaining appraisals of the Collateral, and the reasonable charges of any attorney whom Lender may engage in preparing and filing documents, making title or lien examinations and rendering opinion letters, as well as all fees, costs and expenses incurred by Lender (including all attorneys' fees and including Lender's out of pocket expenses in conducting periodic field examinations of Borrower and the Collateral (including any costs of third-party examiners) plus Lender's prevailing per diem charge for each of its examiners in the field and office, now $950 per person per day), in administering this Agreement, protecting, preserving, enforcing or foreclosing any security interests or rights granted to Lender hereunder, whether through judicial proceedings or otherwise (including advertising costs), enforcing or collecting the Receivables, recovery of or realization upon any other Collateral, or in defending or prosecuting any actions or proceedings arising out of or related to its transactions with Borrower, including actions or proceedings that may involve any person asserting a priority or claim with respect to the Collateral, shall be borne and paid for by Borrower on demand, shall constitute part of the Obligations and may at Lender's option be charged to Borrower's Loan Account. Borrower's obligations under this section shall survive termination of this Agreement for any reason.

## 6.   REPRESENTATIONS, COVENANTS AND WARRANTIES

As an inducement to Lender to enter into this Agreement, Borrower represents, covenants and warrants (which shall survive the execution and delivery of this Agreement) that:

6.1.    Borrower is and at all times during the term of this Agreement shall be a limited liability company duly organized and presently existing in good standing under the laws of the State of Delaware

and is and at all times during the term of this Agreement shall be duly qualified and existing in good standing in every other state in which the nature of Borrower's business requires it to be qualified. Borrower is not aware, and will upon becoming aware promptly notify Lender, of any person organizing under its name in another state.

6.2.    The execution, delivery and performance of this Agreement are within the limited liability company powers of Borrower, have been duly authorized by appropriate limited liability company action and are not in contravention of the terms of Borrower's charter or operating agreement or of any indenture, agreement or undertaking to which Borrower is a party or by which it may be bound. [Except as described on Schedule 6.2,] Borrower is not now the subject of any pending governmental investigation. No receiver or custodian has been appointed for any of the property of Borrower. Except for the approval of the Bankruptcy Court, no consent, approval or authorization of any person, including members of Borrower or any governmental or regulatory authority, that has not been obtained, is required in connection with the execution, delivery and performance by Borrower of this Agreement. Borrower warrants that all financial statements and other reports provided to Lender prior to the Closing Date are true and correct in all material respects.

6.3.    There are no [pending suits], Federal or state tax liens, or judgment liens against Borrower or affecting its assets, except for Permitted Liens. No assets of Borrower are subject to any liens or encumbrances except for Permitted Liens. Borrower has no employee benefit plans subject to ERISA that have accumulated funding deficiencies or liquidity shortfalls as defined and calculated under ERISA or with respect to which Borrower presently has withdrawal liability.

6.4.    Borrower is and shall be, with respect to all Inventory, Equipment, Intellectual Property collateral, cash collateral and other Collateral, the owner thereof free from any lien, security interest or encumbrance of any kind, except for Permitted Liens.  No Receivable or any other Collateral has been or shall hereafter be assigned, pledged or transferred to any person other than the Lender or in any way encumbered or subject to a security interest except to Lender, and except for Permitted Liens, and Borrower shall defend the same against the claims of all persons.

6.5.    Borrower's books and records relating to the Receivables are maintained at the office referred to below. Except as otherwise stated below, the principal executive office of Borrower is located at such address and has been so located on a continuous basis for not less than six months. Borrower shall not change such location without Lender's prior written consent, and, upon making any such change, Lender shall be authorized to file any additional financing statements or other documents or notices which may be necessary under the UCC or other applicable law and Borrower shall execute and deliver to Lender any such documents requiring Borrower's signature, failing which Lender shall be authorized to sign such documents on behalf of Borrower as Borrower's attorney-in-fact. The listing of offices for Schedule 6.5 hereto represents all of Borrower's places of business.  Borrower shall notify Lender of the existence of any additional places of business within 5 Business Days after any such place of business is established.

6.6.    All loans and advances requested by Borrower under this Agreement shall be used to pay in full all obligations owed to Wells Fargo Bank and, thereafter, for the general corporate and business purposes of Borrower and in no event shall Borrower request Lender to remit a loan or advance to an account of Borrower that is used for the specific purpose of  purchasing or carrying margin stock (within the meaning of Regulation U of the Federal Reserve Board) or to extend credit to others for the purpose of purchasing or carrying any such margin stock in contravention of Regulation T, U or X of the Federal Reserve Board; or to the extent that any loans and advances requested by Borrower under this

Agreement shall be used for paying wages of the employees of Borrower, Borrower hereby represents and warrants that it shall withhold .and pay over to the applicable tax authorities any amount thereof as it shall be so required by applicable law.

6.7.   Borrower shall maintain its shipping forms, invoices and other related documents in a form satisfactory to Lender and shall maintain its books, records and accounts in accordance with sound accounting practice. Borrower shall furnish to Lender accounts receivable agings, accounts receivable roll forward reports (in the form attached hereto as Exhibit B) and reconciliations of accounts receivable collateral and the loan balance on the monthly statements provided by Lender to Borrower's records and inventory designations, monthly, not later than the 10th of each month, covering the previous month. Borrower shall furnish to Lender such other information regarding the business affairs and financial condition of Borrower as Lender may, from time to time, reasonably request, including (a) commencing with the fiscal year ended December 31, 2017 and for each fiscal year thereafter, audited financial statements as at the end of and for each such fiscal year of Borrower, as soon as practical and in any event within 120 days after the end of each such fiscal year, in such detail and scope as Lender may require including  a balance sheet, a statement of income, a statement of cash flows and notes, prepared by independent Certified Public Accountants acceptable to Lender; and concurrently with such financial statements, a written statement signed by such independent public accountants to the effect that, (i) in making the examination necessary for their opinion of such financial statements, they have not obtained any knowledge of the existence of any Default, or (ii) if such independent public accountants shall have obtained from such examination any such knowledge, they shall disclose in such written statement the Default and the nature thereof, (b) financial statements prepared internally as at the end of and for each of the first, second and third fiscal quarterly period of Borrower, as soon as practical and in any event within 45 days after the end of each such fiscal quarter of Borrower, in such detail and scope as Lender may require including without limitation, a balance sheet, a statement of income, a statement of cash flows and notes, certified by the Chief Financial Officer of Borrower ("**CFO**"); and concurrently with such financial statements, a written statement signed by the CFO to the effect that, (i) CFO has not obtained any knowledge of the existence of any Default, or (ii) if such CFO has obtained from such examination any such knowledge, such CFO shall disclose in such written statement the Default and the nature thereof.   All such statements and information shall fairly present the financial condition of Borrower, and the results of its operations as of the dates and for the periods, for which the same are furnished.

6.8.   Borrower shall duly pay and discharge all post-petition taxes, assessments, contributions and governmental charges upon or against it or its properties or assets prior to the date on which penalties attach thereto. Borrower shall be liable for any tax (excluding a tax imposed on the overall net income of Lender) imposed upon any transaction under this Agreement or giving rise to the Receivables or which Lender may be required to withhold or pay for any reason and Borrower agrees to indemnify and hold Lender harmless with respect thereto, and to repay Lender on demand the amount thereof.  Until paid by Borrower, Borrower's liability under this paragraph shall be added to the Obligations secured hereunder, and may at Lender's option be charged to Borrower's Loan Account but shall nonetheless be independent hereof and continue notwithstanding any termination hereof.

6.9.   With respect to each Receivable, Borrower hereby represents and warrants that: each Receivable represents a valid and legally enforceable indebtedness based upon an actual and bona fide rendition of services or sale and delivery of property in the ordinary course of Borrower's business which has been completed and finally accepted by the Account Debtor and for which the Account Debtor is unconditionally liable to make payment of the amount stated in each invoice, document or instrument evidencing the Receivable in accordance with the terms thereof, without offset, defense or counterclaim;

each Receivable will be paid in full at maturity; no Receivables have arisen from sales on bill and hold terms; all statements made and all unpaid balances appearing in any invoices, documents, instruments and statements of account describing or evidencing the Receivables are true and correct and are in all respects what they purport to be and all signatures and endorsements that appear thereon are genuine and all signatories and endorsers have full capacity to contract; the Account Debtor owing the Receivable and each guarantor, endorser or surety of such Receivable is solvent and financially able to pay in full the Receivable when it matures; and all recording, filing and other requirements of giving public notice under any applicable law have been duly complied with.

6.10.  Reserved.

6.11.  Prior to the making of any loans hereunder: 1) Lender shall have received an opinion of Borrower's counsel in the form, and as to the matters, required by Lender; 2) Lender shall have received Good Standing Certificates and other certifications with respect to Borrower and any other Person liable on the Obligations from such governmental authorities as Lender shall require; 3) Lender or its agents shall have completed such examinations and appraisals of the Collateral and such searches with regard to Borrower and its assets, as Lender shall require, all at Borrower's expense; 4) Lender shall have received a payoff letter duly executed and delivered by Wells Fargo Bank and Borrower or other evidence of such termination in form and substance satisfactory to Lender, and any other evidence Lender may require that on the Closing Date there shall be no Liens on the Collateral other than Permitted Liens; 5) a lockbox or deposit account complying with Section 5.1 shall have been established which is satisfactory to Lender; 6) Lender shall have received evidence, in form satisfactory to Lender, that Borrower has obtained all insurance certificates and endorsements required by Article 10 hereof; 7) the Loan Availability shall be in an amount equal to or greater than $896,000 plus the sum of all amounts required to be disbursed at closing for the purpose of paying Lender's expenses chargeable to Borrower hereunder and all amounts required to be paid to creditors to induce them to release any liens in the Collateral that are not Permitted Liens; 8) no trustee, examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code or receiver or the like shall have been appointed or designated with respect to Company, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief; and 9) entry of the Permanent Financing Order.

6.12.  During the term of this Agreement, Borrower shall not make any sales to customers by accepting a credit card issued to such customers unless Borrower has prior thereto entered into a merchant agreement with a processor, relating to sales made using such credit card, on terms that are acceptable to Lender, and such processor has agreed to remit the proceeds of such sales to an account of Borrower with respect to which Lender has control in accordance with Section 9-104 of the UCC.

6.13.  Attached as Exhibit C is a listing of all of Borrower's patents, trademarks and copyrights. So long as any Obligations remain outstanding, Lender is hereby irrevocably authorized to use any of Borrower's patents, trademarks and copyrights for the purpose of enforcing Lender's security interest in the Collateral and disposing of any of the Collateral.

6.14.  So long as any Obligations remain outstanding, Borrower shall (i) advise Lender of the existence of any commercial tort claims in favor of Borrower, which advice shall be given to Lender in writing no later than 10 days after Borrower becomes aware of existence of such a claim in its favor; (ii) within 5 Business Days after Lender's request therefor, provide Lender with a listing of all deposit accounts and securities accounts maintained by Borrower and a listing of all letters of credit issued and outstanding in favor of Borrower as beneficiary and, if requested by Lender, arrange for the execution by each depository bank and financial intermediary of a control agreement in Lender's favor with respect to such accounts, and by each letter of credit issuer of a consent to an assignment of the proceeds of such

15

letter of credit to Lender, in each case in form and content satisfactory to Lender; (iii) maintain in effect in favor of Lender, agreements (in form satisfactory to Lender) executed by the landlords of Borrower's places of business and the bailees of its property, pursuant to which Lender is granted access to such places of business and such bailees are directed to honor Lender's instructions with respect to the disposition of such property.

6.15.  Until indefeasible payment in full of the Obligations, Borrower shall not (i) make any loans to officers, directors, members or Affiliates; (ii) engage in any other transactions with Affiliates except on terms similar to those that would be in effect in transactions between unrelated parties (iii) incur or repay indebtedness for borrowed money or guaranty the obligations of Affiliates or other Persons; (iv) sell, transfer or otherwise dispose of any assets except for sale of Inventory in the normal course; (v) declare any dividends, redeem or repurchase any stock, or make any other distributions in respect of its stock; or (vi) enter into any agreements to buy or sell goods on consignment terms; or (vi) merge with or into any entity or undergo any other restructuring or reorganization including reorganizations that would result in Borrower being organized under the laws of a state other than Delaware.

6.16.  Borrower shall not (i) conduct any business or engage in any transaction or dealing with any Blocked Person (as hereafter defined), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person; (ii) deal in, or otherwise engage in any transaction relating to any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224, the USA Patriot Act or any other Anti-Terrorism Law.  Borrower shall deliver to Lender any certification or other evidence requested from time to time by Lender in its sole discretion, confirming Borrower's compliance with this Section.  Borrower is not in violation of any Anti-Terrorism Law  and Borrower is not a Person (a "**Blocked Person**") that (a) is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (b) is owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224; (c) any financial institution is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (d) commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224; (e) is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or is affiliated or associated with a person or entity listed above;  (f) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

        For purposes of this Section 6.16, (i) "Anti-Terrorism Laws" shall mean any laws, regulations, rules, orders and directives relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the Laws comprising or implementing the Bank Secrecy Act, and the Law administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing laws, regulations, rules, orders and directives may from time to time be amended, renewed, extended, or replaced); (ii) "**Executive Order No. 13224**" shall mean Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced; and (iii) "**USA Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

6.17. Borrower shall deliver to Lender within 5 days of any of Borrower's senior officers obtaining knowledge of any condition or event which constitutes, or might reasonably be expected to constitute, a Default or that any Person has given notice to Borrower or any Affiliates of Borrower or taken any other action with respect to a claimed Default, Borrower shall deliver to Lender an officer's certificate describing the same and the period of existence thereof and specifying what action Borrower has taken, are taking and propose to take with respect thereto.

6.18. In the event Borrower's current Manager ceases to be the Manager for any reason, Borrower shall promptly replace him with an independent manager (the **"Independent Manager"**) reasonably acceptable to Lender. For the purposes hereof, the Independent Manager shall be an individual who is not at such time, and shall not have been at any time during the preceding three years, (i) a director, officer, employee, manager or affiliate of Borrower of any of its Affiliates, or of any major creditor (as hereinafter defined) thereof, or (ii) the direct, indirect or beneficial owner at the time of such individual's appointment as an Independent Manager or at any time thereafter while serving as an Independent Manager, of any membership interest of Borrower or its Affiliates, or (iii) a relative of any person described in the foregoing clauses (i) or (ii). For purposes of this paragraph 6.18, the term **"major creditor"** shall mean a financial institution to which Borrower or any of its affiliates has outstanding indebtedness for borrowed money in a sum sufficiently large as would reasonably be expected to influence the judgment of the Independent Manager adversely to the interest of Borrower when its interests are adverse to those of Borrower or any of its affiliates.

6.19. Borrower shall cause Investment Banker to consult with Lender and to share with Lender all reports and other information prepared by or in the possession of the Investment Banker relating to the Collateral, or the financial condition or operations of the business of Borrower or the sale process described herein.

6.20. Borrower shall not permit to exist or remain outstanding any loans or advances to Borrower from any officer, director or member of Borrower or any subsidiary, related entity or affiliate of Borrower, except for the pre-petition indebtedness of Borrower to St. Cloud Capital Partners II LP.

6.21. Borrower shall not make any payment in respect the Subordinated Debt if any such payment is inconsistent with the terms of any agreement between the Subordinated Creditor and Lender. Notwithstanding the foregoing, Borrower shall not make any payments in respect of the Subordinated Debt owed to St. Cloud Capital Partners, L.P. or Medley Capital Corporation and all amounts owed thereto shall accrue and capitalize to the outstanding principal amount of indebtedness owed under the financing agreements therewith.

6.22. Borrower shall fully indemnify and hold Lender harmless from any liability or claim arising out of or related to any brokerage fee, finder's fee, commission, or similar payable arising from Borrower's entry into this Agreement.

6.23. Upon (a) the receipt by Lender, of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Lender to secure any Obligations that survive or continue beyond the termination of this Agreement and the Loan Documents, and (b) the termination of this Agreement and the Loan Documents (the **"Payment Date"**), in consideration of the agreements of Lender contained herein and the making of any loans by Lender, Borrower hereby covenants and agrees to execute and deliver in favor of Lender a valid and binding termination and release agreement, in form and substance satisfactory to Lender. If Borrower violates such covenant, Company agrees to pay, in addition to such other damages as Lender and its respective

successors and assigns, and its present and former members, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Lender and all such other parties, in their capacities as such, being hereinafter referred to collectively as the **"Releasees"** and individually as a **"Releasee"**) may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

6.24. Borrower shall enter into a deposit account control agreement with Lender with respect to its bank accounts located at Wells Fargo Bank in form and substance acceptable to Lender prior to the Closing Date.

## 7. BUDGET.

7.1. Borrower has delivered to Lender, a post-petition Budget, covering the period commencing with the week beginning on February [20], 2017 and ending on [May 8], 2017, which has been annexed hereto as Exhibit E; provided that the Budget may be amended (to the extent such amended Budget is approved by Lender in writing). The Budget has been, and any amendment to the Budget shall be, thoroughly reviewed and approved by the Consultant (as defined below), its management and its restructuring advisors. The Budget sets forth and any amendment to the Budget shall set forth, for the periods covered thereby, projected weekly operating cash disbursements and cash receipts for each week covered by the Budget, in form and substance acceptable to Lender.

7.2. Not later than 5:00 p.m. (Eastern time) on the Wednesday of each week commencing on March [3], 2017, Borrower shall furnish to Lender, in form and substance satisfactory to Lender, a report (the **"Budget Compliance Report"**) that sets forth, on both a week by week basis and a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of the actual cash disbursements to the projected cash disbursements and the actual cash receipts to the projected cash receipts, each as set forth in the Budget for such measurement period, together with a certification from the Borrower's CFO that no Material Budget Deviation (as defined below) has occurred.

7.3. It shall constitute a Material Budget Deviation and an additional Event of Default if (i) commencing with the week ending February [17], 2016, and each week thereafter, the actual aggregate cash receipts for the trailing three (3) week period are less than eighty-five percent (85%) of the projected aggregate cash receipts set forth in the Budget for such trailing three (3) week period; and (ii) actual aggregate cash disbursements for the trailing three (3) week period are more than one hundred and twenty percent (120%) of the projected aggregate cash disbursements set forth in the Budget for such trailing three (3) week period.

7.4. Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Lender, (i) a failure to maintain the deviations in the Budget as set forth in Section 7.3 hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a **"Material Budget Deviation"**) and (ii) the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Lender, as provided in Section 7.2 hereof shall constitute an Event of Default. Lender is relying upon Borrower's delivery of, and compliance with, the Budget in accordance with this Section 7 in determining to enter into the post-petition financing arrangements provided for herein.

7.5. Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Lender that are reimbursable by Borrower or any other amounts owing by Borrower to Lender (including, without limitation reasonable attorneys and consulting fees

and expenses) in accordance with this Agreement and the other Loan Documents, such projections shall not limit, impair, modify or waive the Borrower's obligation to pay the actual amounts due to Lender in respect of such costs, expenses and other amounts owing to Lender in accordance with this Agreement and the other Loan Documents.

8. **PLAN MILESTONES; SALE MILESTONES.**

8.1. <u>Plan Milestones</u>.

(i)     On or before July 1, 2017, Debtor shall (i) finalize and deliver to Lender a business plan, (ii) deliver to Lender a draft plan of reorganization and (iii) deliver to Lender a draft disclosure statement, each in form and substance acceptable to Lender;

(ii)    On or before August 1, 2017, Debtor shall file with the Bankruptcy Court a proposed Acceptable Reorganization Plan;

(iii)   On or before September 1, 2017, Debtor shall obtain approval of a disclosure statement in form and substance acceptable to Lender;

(iv)    On or before October 1, 2017, Debtor shall commence solicitation of acceptances for an Acceptable Reorganization Plan pursuant to a  disclosure statement and solicitation procedures approved by the Bankruptcy Court that are in form and substance acceptable to Lender;

(v)     On or before November 15, 2017, the Debtor shall obtain entry of an order of the Bankruptcy Court confirming an Acceptable Reorganization Plan, which order shall be in form and substance acceptable to Lender; and

(vi)    On or before November 30, 2017, the effective date of an Acceptable Reorganization Plan shall have occurred and the order confirming the Acceptable Reorganization Plan shall not have been amended, modified, supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by Lender.

8.2. <u>Sale Milestones</u>. If at any time Debtor fails to meet any of the Plan Milestones set forth in Section 8.1 hereof (a **"Milestone Default"**) or the occurrence of any other Default hereunder (an "Other Default"), Debtor agrees that:

(i)     No later than 10 days following a Milestone Default or Other Default, the Debtor shall file a motion, in form and substance satisfactory to Lender, requesting approval from the Bankruptcy Court to retain a nationally-recognized investment banking firm acceptable to Lender on terms and conditions acceptable to Lender in its discretion (**"Investment Banker"**) to conduct the marketing and sale process for all or substantially all of the assets of Borrower. For the avoidance of doubt, SSG Capital Advisors LLP shall be deemed an acceptable investment banker to Lender;

(ii)    No later than 20 days following a Milestone Default or Other Default, the Bankruptcy Court shall have entered an order, in form and substance satisfactory to Lender, authorizing the retention of the Investment Banker on terms and conditions acceptable to Agent in its discretion;

(iii)   No later than 20 days days following a Milestone Default or Other Default, Debtor shall obtain the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Lender (i) approving the bidding procedures for the sale of all or substantially all of the Debtor's assets in accordance with Section 363 of the Bankruptcy Code (the **"Sale"**),

including, without limitation, a form of asset purchase agreement acceptable to Lender in its sole discretion, and (ii) providing that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses directly arising from the closing of such Sale(s), subject to approval by Lender shall be remitted to Lender for application against, and in permanent reduction of, the Maximum Credit Facility (the **"Bid Procedures Order"**);

(iv)    Not later than [forty five (45)] days following a Milestone Default or Other Default, the Debtor shall have entered into an agreement in form and substance acceptable to Lender with a "stalking horse" bidder, reasonably acceptable to Lender, committing to purchase all or substantially all of the Debtor's assets;

(v)    No later than [seventy (70)] days following a Milestone Default or Other Default, Debtor shall conduct an auction (the **"Auction"**), in accordance with the Bid Procedures Order, if more than one bona fide offer is received meeting the conditions set forth in the Bid Procedures Order;

(vi)    Not later than two (2) Business Days after the Auction, the Bankruptcy Court shall have entered an order (the **"Sale Order"**), which order shall provide for, among other things, distribution of sale proceeds to Lender in a minimum cash amount not less than the amount required to satisfy the Obligations owed to Lender, and otherwise in form and substance satisfactory to Lender, approving the sale or sales of all or substantially of the Debtor's assets, on terms and conditions acceptable to Lender, and authorizing and directing that all proceeds from the Sale(s) be remitted to Lender for application against and permanent reduction of the Obligations;

(vii)    Not later than two (2) Business Days after the Sale Order is entered, the closing of the Bankruptcy Court-approved Sale(s) shall have occurred.

(viii)    Debtor confirms, acknowledges and agrees that notwithstanding anything to the contrary contained in this Agreement, any failure to comply with the requirements set forth in this Section 8.2 shall constitute an additional immediate Event of Default under this Agreement.

## 9.  APPOINTMENT OF CHIEF RESTRUCTURING OFFICER.

9.1.    Borrower shall retain, at all times during which the Obligations remain outstanding, on terms and conditions acceptable to Lender and at the sole cost and expense of Borrower, a Person acceptable to Lender as Borrower's consultant (the **"Consultant"**).    The scope of Consultant's engagement shall be acceptable to Lender and, among other things, shall include the assistance in the preparation of and compliance with, on an ongoing basis, the Budget and compliance with the terms and conditions set forth in the Loan Documents.

9.2.    Borrower hereby irrevocably authorizes and directs the Consultant to consult with Lender and to share with Lender all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the Consultant relating to the Collateral, or the financial condition or operations of the business of Borrower.  Borrower agrees to provide the Consultant with complete access to all of the books and records of Borrower, all of the premises of Borrower and to all management and employees of Borrower as and when deemed necessary by the Consultant.

9.3.    At any time prior to the indefeasible payment in full of all Obligations in accordance with the terms and conditions contained in this Agreement, the Loan Documents and any order of the

Bankruptcy Court, Borrower shall not amend, modify or terminate the retention agreement with the Consultant without the prior written consent of Lender.  Borrower acknowledges and agrees that Borrower shall cause the Consultant to keep Lender (1) fully informed of the progress of the business and operations of Borrower and respond fully to any inquiries of Lender regarding the business and operations of Borrower, and (2) communicate and fully cooperate with Lender and share all information with Lender regarding Borrower, and the business and operations of Borrower.

9.4.  If the Consultant terminates its engagement with Borrower, Borrower shall immediately notify Lender in writing and provide Lender with a copy of any notice of termination immediately upon the sending of such notice by such Consultant.  Any replacement or successor Consultant shall be acceptable to Lender and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Lender within five (5) Business Days immediately following the notice of termination of the resigning Consultant, or within such longer period of time as Lender may agree in writing.  Failure to comply with the terms and conditions of this Section 9.4 shall constitute an Event of Default.

## 10. BORROWER'S INSURANCE

10.1.  Borrower covenants and agrees that, on and after the date hereof, until payment in full of the Obligations and termination of this Agreement, Borrower shall obtain and maintain in effect, at Borrower's sole expense, policies of insurance as more specifically set forth on Exhibit D annexed hereto, in form and substance satisfactory to Lender, each of which shall have ratings of at least "A-VIII" by A.M. Best Company, and shall otherwise be approved by Lender.

10.2.  Borrower hereby directs all insurers under such policies of insurance to pay all proceeds of insurance policies directly to Lender.  Borrower irrevocably makes, constitutes and appoints Lender (and each officer, employee or agent designated by Lender) as Borrower's true and lawful attorney-in-fact for the purpose of (i) making, settling and adjusting such claims under all such policies of insurance if Borrower fails to make such claim within fifteen (15) days after any casualty or fails to diligently prosecute such claim, (ii) endorsing the name of Borrower on any check, draft, instrument or other item of payment pertaining to the Collateral received by Borrower or Lender pursuant to any such policies of insurance, and (iii) making all determinations and decisions with respect to such policies of insurance as they relate to the Collateral.  Borrower agrees to provide Lender with prompt written notice of any change, amendment or modification to any insurance policy.

10.3.  Lender is authorized to collect all such insurance proceeds and, at Lender's option:  (i) apply (A) such proceeds against the outstanding principal amount of the Obligations, or (ii) allow Borrower to use such proceeds, or a part thereof, to repair any damage or restore, replace or rebuild the Collateral that was the subject of such proceeds.  Notwithstanding anything herein to the contrary, at any time when a Default has occurred and is continuing, if Lender receives proceeds of insurance or is holding proceeds of insurance theretofore received by Lender, Lender may apply the same to the Obligations at any time and from time to time as it may determine in its discretion.  If no Default has occurred and is continuing and Borrower has been permitted to apply insurance proceeds to repair, restore, replace or rebuild property, then Lender will return any insurance proceeds to Borrower which Lender continues to hold after any such repair, restoration, replacement or rebuilding of such property is completed to Lenders' satisfaction as determined in its discretion.

10.4.  If Borrower fails to provide Lender with evidence of the insurance coverage required by this

Agreement, Lender may purchase insurance, at Borrower's expense, to protect Lender's interests in the Collateral. This insurance may, but need not, protect the interests of Borrower. The coverage that Lender purchases may not pay any claim that Borrower may make or any claim that is made against Borrower in connection with the Collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance for the Collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges that may be imposed in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance shall be added to the Obligations. The costs of the insurance may be more than the cost of insurance that Borrower may be able to obtain on its own.

## 11. SPECIFIC POWERS OF LENDER

11.1. Borrower hereby constitutes Lender or its agent, or any other person whom Lender may designate, as Borrower's attorney, at Borrower's own cost and expense to exercise at any time all or any of the following powers which, being coupled with an interest, shall be irrevocable until all Obligations have been paid in full: (a) to receive, take, endorse, assign, deliver, accept and deposit, in Lender's or Borrower's name, any and all checks, notes, drafts, remittances and other instruments and documents relating to Receivables and proceeds thereof; (b) to receive, open and dispose of all mail addressed to Borrower and to notify, following the occurrence and during the continuation of an alleged event of Default, postal authorities to change the address for delivery thereof to such address as Lender may designate; (c) Following the occurrence and during the continuation of an alleged event of Default, to transmit to Account Debtors indebted on Receivables notice of Lender's interest therein and to request from such Account Debtors at any time, in Borrower's name or in Lender's or that of Lender's designee, information concerning the Receivables and the amounts owing thereon; (d) Following the occurrence and during the continuation of an alleged event of Default, to notify Account Debtors to make payment directly to Lender; and (e) to take or bring, in Borrower's name or Lender's, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of the Receivables. In addition, to the extent permitted by law, Lender may file one or more financing statements, naming Borrower as debtor and Lender as secured party and indicating therein the types or describing the items of Collateral. Without limitation of any of the powers enumerated above, Lender is hereby authorized to accept and to deposit all collections in any form, relating to Receivables, received from or for the account of Account Debtors (whether such collections are remitted directly to Lender by Account Debtors or are forwarded to Lender by Borrower), including remittances  which may reflect deductions taken by Account Debtors, regardless of amount, the Loan Account of Borrower to be credited only with amounts actually collected on Receivables in accordance with Section 5.1. Borrower hereby releases (i) any bank, trust company or other firm receiving or accepting such collections in any form, and (ii) Lender and its officers, employees and designees, from any liability arising from any act or acts hereunder or in furtherance hereof, whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact.

## 12. LENDER'S REMEDIES

12.1.   Borrower agrees that all of the loans and advances made by Lender under the terms of this Agreement, together with all Obligations of Borrower as defined herein (unless otherwise provided in any instrument evidencing the same or agreement relating thereto), shall be payable by Borrower at Lender's demand at the office of Lender in New York, New York. In addition, all Obligations shall be, at Lender's option, due and payable without notice or demand upon termination of this Agreement or upon the

occurrence of any one or more of the following events of default (**"Default"**): (1) if Borrower shall fail to pay to Lender when due any amounts owing to Lender under any Obligation, or if there shall occur a breach by Borrower or any Affiliate of Borrower of any of the terms, covenants, conditions or provisions of this Agreement or any other agreement between Borrower or any of its Affiliates and Lender or any of its Affiliates or if Borrower shall fail to pay when due any indebtedness for borrowed money; (2) if any guarantor, endorser or other person liable on the Obligations or who has pledged or granted collateral security for the Obligations, shall die, terminate or attempt to terminate its guaranty or pledge agreement or shall breach any of the terms, covenants, conditions or provisions of any guarantee, endorsement or other agreement of such person with, or in favor of, Lender or if a material portion of any tangible Collateral for the Obligations is destroyed or lost or rendered valueless; (3) if any representation, warranty, or statement of fact made to Lender or an Affiliate of Lender at any time by or on behalf of Borrower or an Affiliate of Borrower is or becomes false or misleading in any material respect; (4)if Borrower discontinues doing business for any reason, or if a custodian, receiver or trustee of any kind is appointed for it or any of its property; provided that the commencement of the Chapter 11 Case shall not constitute a Default; (5) if there is a change (by voluntary transfer, death or otherwise) in Borrower's controlling stockholders or owners; (6) if (x) Borrower shall commit a post-petition default under or breach the terms of any present or future lease (each a **"Lease"**) of any premises now or hereafter leased by Borrower other than Borrower's Bay Shore plant (**"Leased Premises"**) or (y) Lender shall receive notice from any lessor of any Leased Premises that a default has occurred under any Lease, or that any Lease has been terminated; (7) any employee benefit plan of Borrower subject to ERISA is completely or partially terminated or the Pension Benefit Guaranty Corporation commences proceedings for the purpose of effecting any such termination or an event or circumstance occurs which could result in any such termination; (8) if a claim is made or threatened, or a proceeding is commenced, by any governmental agency or authority against Borrower or any Affiliate of Borrower under any Environmental Laws; 9) the occurrence of any condition or event which permits Lender to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "[Event of Default]" (as defined in the Financing Order); 10) the termination or non-renewal of the [Financing Agreements] as provided for in the Financing Order; 11) any act, condition or event occurring after the Petition Date that has or would reasonably expect to result in the occurrence of a Material Adverse Effect upon the assets of Company, or the Collateral, or the ability of Debtor to perform under and comply with the Budget in accordance with the terms and conditions hereof, or the rights and remedies of Lender under this Agreement or any other Loan Document or the Financing Order; 12) conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code; 13) dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily; 14) the grant of a lien on or other interest in any property of Company, other than a Permitted Lien or a lien or encumbrance permitted by the Financing Order, which is superior to or ranks in parity with Lender's security interest in or lien upon the Collateral; 15) the grant of an administrative expense claim in the Chapter 11 Case, other than such administrative expense claim permitted by the Financing Order or this Agreement, which is superior to or ranks in parity with Lender's Superpriority Claim (as defined in the Financing Order); 16) the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender); 17) the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; 18) the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code; 19) the filing of a plan of reorganization or liquidation by or on behalf of Debtor, to which Lender has not consented in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein; 20) the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case, to which Lender has not consented to in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and

23

conditions contained herein;  21) entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting similar relief) on any property of the Debtor having a value in excess of $25,000 without the prior written consent of Lender;  22) the filing of a motion by Debtor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Lender directly) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise); or 23) If Debtor suspends or discontinues or is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of Debtor, taken as a whole, or a trustee, receiver or custodian is appointed for Debtor, or any of their respective properties, except to the extent such suspension or discontinuance of business occurs in accordance with the terms of this Agreement.

12.2.  Upon the occurrence of any Default, (i) Borrower shall pay to Lender, as liquidated damages and as part of the Obligations, in addition to amounts payable under Section 13.1 hereof, a charge at the rate of one and one half percent per month upon the outstanding balance of the Obligations from the date of Default until the date of full payment of the Obligations, which charge shall be in lieu of compensation payable under Section  3.1 from such date; provided, that in no event shall such rate exceed the Maximum Rate and (ii) Lender shall have the right (in addition to any other rights Lender may have under this Agreement or otherwise) without further notice to Borrower, to withhold any further advances and to file a motion for relief from the automatic stay (as to which the Borrower hereby irrevocably consents to the scheduling of a hearing on 5 business days notice) which, if granted, would allow Lender to enforce payment of any Receivables, to settle, compromise, or release in whole or in part, any amounts owing on Receivables, to prosecute any action, suit or proceeding with respect to Receivables, to extend the time of payment of any and all Receivables, to make allowances and adjustments with respect thereto, to issue credits in Lender's name or Borrower's, to sell, assign and deliver the Receivables (or any part thereof) and any property held by Lender or by Borrower for Lender's account, at public or private sale, at broker's board, for cash, upon credit or otherwise, at Lender's sole option and discretion, and Lender may bid or become purchaser at any such sale if public, free from any right of redemption which is hereby expressly waived. Borrower agrees that the giving of five days' notice by Lender, sent by ordinary mail, postage prepaid, to the mailing address of Borrower set forth in this Agreement, designating the place and time of any public sale or the time after which any private sale or other intended disposition of the Receivables or any other security held by Lender is to be made, shall be deemed to be reasonable notice thereof and Borrower waives any other notice with respect thereto. The net cash proceeds resulting from the exercise of any of the foregoing rights or remedies shall be applied by Lender to the payment of the Obligations in such order as Lender may elect, and Borrower shall remain liable to Lender for any deficiency. Notwithstanding anything to the contrary contained in this section, (i) to the extent that an event or occurrence described in this section consists of Borrower's failure to take, do or perform an act or action, then such failure shall not constitute a Default if no other Default has occurred and if such act or action is taken, done or performed by Borrower within 5 Business Days after Borrower's receipt of written notice from Lender that the act or action is required to be taken, done or performed by Borrower and has not been taken, done or performed; and (ii) to the extent that an event or occurrence described in this section consists of the commencement of a proceeding against Borrower under Federal or state law or the appointment of a receiver or custodian under Federal or state law, then the commencement of such proceeding or the appointment of such receiver or custodian shall not constitute a Default if no other Default has occurred and if such proceeding or appointment is contested by Borrower within the time period and in the manner required by law and is dismissed, terminated or vacated within ten (10) Business Days after such commencement or appointment.

12.3.    The enumeration of the foregoing rights and remedies is not intended to be exhaustive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies Lender may have under the UCC or other applicable law. Lender shall have the right, in its sole discretion, to determine which rights and remedies, and in which order any of the same, are to be exercised, and to determine which Receivables are to be proceeded against and in which order, and the exercise of any right or remedy shall not preclude the exercise of any others, all of which shall be cumulative. No act, failure or delay by Lender shall constitute a waiver of any of its rights and remedies. No single or partial waiver by Lender of any provision of this Agreement, or breach or default thereunder, or of any right or remedy which Lender may have shall operate as a waiver of any other provision, breach, default, right or remedy or of the same provision, breach, default, right or remedy on a future occasion. Borrower waives presentment, notice of dishonor, protest and notice of protest of all instruments included in or evidencing any of the Obligations or the Receivables and any and all notices or demands whatsoever (except as expressly provided herein). Lender may, at all times, proceed directly against Borrower to enforce payment of the Obligations and shall not be required to first enforce its rights in the Receivables or any other security granted to it. Lender shall not be required to take any action of any kind to preserve, collect or protect its or Borrower's rights in the Receivables or any other security granted to it.

12.4.    BORROWER HEREBY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN THE EVENT OF ANY LITIGATION WITH RESPECT TO ANY MATTER CONNECTED WITH THIS AGREEMENT, THE OBLIGATIONS, THE RECEIVABLES, OR ANY OTHER TRANSACTION BETWEEN THE PARTIES AND BORROWER HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND OF ANY FEDERAL COURT LOCATED IN SUCH STATE IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE OBLIGATIONS. IN ANY SUCH LITIGATION BORROWER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE THEREOF MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO BORROWER AT ITS PLACE OF BUSINESS SET FORTH ABOVE. WITHIN 30 DAYS AFTER SUCH MAILING, BORROWER SHALL APPEAR IN ANSWER TO SUCH SUMMONS, COMPLAINT OR OTHER PROCESS, FAILING WHICH BORROWER SHALL BE DEEMED IN DEFAULT AND JUDGMENT MAY BE ENTERED BY LENDER AGAINST BORROWER FOR THE AMOUNT OF THE CLAIM AND OTHER RELIEF REQUESTED THEREIN.

12.5.    Borrower hereby agrees to indemnify Lender and hold Lender harmless from and against any liability, loss, damage, suit or proceeding ever suffered or incurred by Lender (including attorneys' fee) as a result of Borrower's failure to observe, perform or discharge Borrower's duties hereunder or as a result of Borrower's breach of any of the representations, warranties and covenants of this Agreement. This indemnity shall survive termination of this Agreement for any reason.

## 13. EFFECTIVE DATE, CONTROLLING LAW AND TERMINATION

13.1.    This Agreement shall become effective upon entry of the  Permanent Financing Order and shall continue in full force and effect until February 28, 2018 (the **"Renewal Date"**) and from year to year thereafter, unless sooner terminated as herein provided. Borrower or Lender may terminate this Agreement on the Renewal Date or on the anniversary of the Renewal Date in any year by giving the other party at least ninety (90) days', and not more than one hundred twenty (120) days' prior written

notice by registered or certified mail, return receipt requested.  Should a Default occur hereunder, this Agreement will be terminable by Lender at any time and Borrower shall, upon any such termination by Lender, or upon termination of this Agreement by Borrower for any reason (including a termination effective at the end of a Contract Period) other than termination by Lender in the absence of a Default, pay to Lender, as a termination fee and liquidated damages and as part of the Obligations, in addition to amounts payable under Section 12.1 hereof, an amount equal to two percent of the Maximum Credit Facility then in effect. In the event that Lender shall permit termination of this Agreement by Borrower other than as provided herein, as a condition to such termination, Borrower shall pay to Lender such additional liquidated damages in addition to performance of any other conditions to such termination.  No termination of this Agreement, however, shall relieve or discharge Borrower of its duties, obligations and covenants hereunder until such time as all Obligations have been paid in full, and the continuing security interest in Receivables and other Collateral granted to Lender hereunder or under any other agreement shall remain in effect until such Obligations have been indefeasibly paid and performed in full and any provision hereof that by its terms survives termination of this Agreement  shall survive pursuant to such terms. No provision hereof shall be modified or amended orally or by course of conduct but only by a written instrument expressly referring hereto signed by both parties. This Agreement embodies the entire agreement between Lender and Borrower as to the subject matter hereof and supersedes all prior agreements (whether oral or written) as to the subject matter hereof.   This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, administrators, successors and assigns, provided, however, that Borrower may not assign this Agreement or its rights hereunder without Lender's prior written consent.  Borrower consents to Lender's sale of participations in the loans made under this Agreement.

13.2.   ALL LOANS SHALL BE DISBURSED BY LENDER FROM ITS OFFICE IN THE STATE OF NEW YORK, SHALL BE PAYABLE BY BORROWER AT SUCH OFFICE, AND THIS AGREEMENT AND ALL TRANSACTIONS THEREUNDER SHALL BE DEEMED TO BE CONSUMMATED IN SUCH STATE AND SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THAT STATE.  If any part or provision of this Agreement is invalid or in contravention of the applicable laws or regulations of any controlling jurisdiction, such part or provision shall be severable without affecting the validity of any other part or provision of this Agreement. Notwithstanding any provision herein or in any related document, Lender shall never be entitled to receive, collect, or apply, as interest on the Loan Account, any amount in excess of the maximum rate of interest (**"Maximum Rate"**) permitted to be charged from time to time by applicable law (if such law imposes any maximum rate), and in the event Lender ever receives, collects, or applies as interest, any amount in excess of the Maximum Rate, such amount shall be deemed and treated as a partial prepayment of the principal of the Loan Account; and, if the principal of the Loan Account and all other of Lender's charges other than interest are paid in full, any remaining excess shall be paid to Borrower.

## 14. MISCELLANEOUS

14.1. Unless otherwise specifically provided in this Agreement, any notices, requests, demands or other communications permitted or required to be given under this Agreement shall be in writing and shall be sent by facsimile, hand delivery or by a nationally recognized overnight delivery service, to the addresses and facsimile numbers of the parties set forth below (or to such other address or facsimile number as a party may hereafter designate by a notice to the other that complies with this section) and shall be deemed given (a) in the case of a notice sent by facsimile, when received by the recipient if the

sending party receives a confirmation of delivery from its own facsimile machine; and (b) in the case of a notice that is hand delivered or sent by such overnight courier, when delivered (provided that the sending party retains a confirmation of delivery). Any notice which, pursuant to the terms hereof must be sent by Borrower by certified or registered mail shall be deemed given and effective when received by Lender, or Borrower, as the case may be.

| | |
|---|---|
| If to Lender | If to Borrower |
| Rosenthal & Rosenthal, Inc. | Prestige Industries LLC |
| 1370 Broadway | 1099 Wall Street West, Suite 100 |
| New York NY 10018 | Lyndhurst, NJ 07071 |
| Attn: Michael Wenger, Esq., with a copy to | Attn: Jonathan Fung |
| Robert Miller | Facsimile: |
| Facsimile: (212) 356-0989 | |

14.2. Nothing contained herein shall impose on Lender any liability for any contracts, undertakings or other obligations of Borrower to others, including obligations of Borrower to any Account Debtor for breach of the terms of any contract of sale between Borrower and the Account Debtor.

14.3. Wherever in this Agreement (i) the term "including" appears, such term shall be deemed to mean "including without limitation"; (ii) the term "satisfactory" or "acceptable" to Lender appears, such terms shall be deemed to mean "acceptable" or "satisfactory" to Lender and its counsel in their sole and absolute discretion; and (iii) the terms "in the opinion" or "in the judgment" of Lender appear, such terms shall be deemed to mean "in the sole opinion" and "in the sole judgment" of Lender and its counsel.

14.4. Terms used in this Agreement that are not defined in this Agreement but are defined in the UCC shall have the meanings given in the UCC.

14.5.    DRAFTING PRESUMPTION. In the event of any ambiguity or dispute regarding the definition or meaning of any word, phrase, or other verbiage, or the construction of any provision in this Agreement, there shall be no presumption favoring the definition, meaning or construction propounded by a particular party based upon which party (or which party's attorney) drafted the word, verbiage or provision at issue, and same will be deemed mutually drafted.

14.6.    AUTHORIZATION TO COMPLETE BLANKS. Lender is authorized to complete any blank space in this Agreement and in any Loan Documents entered into between Borrower and Lender in connection with this Agreement. Such completion shall be conclusive, final and binding on Borrower in the absence of manifest error and if not inconsistent with any arrangement between Borrower and Lender.

IN WITNESS WHEREOF, Lender and Borrower have caused this Agreement to be executed by their respective corporate officers thereto duly authorized as of the day and year first above written.

PRESTIGE INDUSTRIES LLC

By:_____
Name:
Title:

Attest:

_____
 Secretary


Accepted:

ROSENTHAL & ROSENTHAL, INC.


By:_____

**Exhibit A**

**PERMITTED LIENS**

(a) the security interests and liens of Lender;

(b) liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower, or Guarantor or Subsidiary, as the case may be and with respect to which adequate reserves have been set aside on its books;

(c) non-consensual statutory liens (other than liens securing the payment of taxes) arising in the ordinary course of such Borrower's or Guarantor's business to the extent: (i) such liens secure indebtedness which is not overdue or (ii) such liens secure indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or Guarantor, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(d) zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of such Borrower as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

(e) purchase money security interests in machinery and equipment (including capital leases where the landlord has signed a subordination agreement/waiver acceptable to Lender);

(f) pledges and deposits of cash by any Borrower or Guarantor after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Borrower or Guarantor as of the date hereof;

(g) pledges and deposits of cash by Borrower after the date hereof to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of Borrower as of the date hereof; provided, that, in connection with any performance bonds issued by a surety or other person, the issuer of such bond shall have waived in writing any rights in or to, or other interest in, any of the Collateral in an agreement, in form and substance satisfactory to Lender;

(h) liens arising from (i) operating leases and the precautionary UCC financing statement filings (satisfactory to Lender) in respect thereof and (ii) equipment or other materials which are not owned by Borrower located on the premises of such Borrower (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Borrower or Guarantor and the precautionary UCC financing statement filings (satisfactory to Lender) in respect thereof;

(i) judgments and other similar liens arising in connection with court proceedings that do not constitute a Default, provided, that, (i) such liens are being contested in good faith and by appropriate proceedings diligently pursued, (ii) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor, and (iii) a stay of enforcement of any such liens is in effect; and

(j) any other liens to which Lender has consented in writing; and

(k) security interests securing the pre-petition indebtedness of Borrower to St. Cloud Capital Partners II LP and Medley Capital Corporation.

Schedule 6.3

Litigation

Schedule 6.5

Other locations of Borrower

2019 91 Street, North Bergen, NJ

2 Wood Street, Paterson, NJ

ANNEX A

Reserved.

**Exhibit B**

**MONTHLY ACCOUNTS RECEIVABLE ROLLFORWARD REPORT**

SAMPLE FORM

| Date | Beginning Balance | + Gross Sales | - (Credits) | - (Net Collections) | - (Discounts) | + Debit Adj | - (Credit Adj) | + Non A/R Cash | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|
| 8/31/2008 | | | | | Enter opening aging balance here | | | → | |
| 9/1/2008 | 0.00 | | | | | | | | 0.00 |
| 9/2/2008 | 0.00 | | | | | | | | 0.00 |
| 9/3/2008 | 0.00 | | | | | | | | 0.00 |
| 9/4/2008 | 0.00 | | | | | | | | 0.00 |
| 9/5/2008 | 0.00 | | | | | | | | 0.00 |
| 9/6/2008 | 0.00 | | | | | | | | 0.00 |
| 9/7/2008 | 0.00 | | | | | | | | 0.00 |
| 9/8/2008 | 0.00 | | | | | | | | 0.00 |
| 9/9/2008 | 0.00 | | | | | | | | 0.00 |
| 9/10/2008 | 0.00 | | | | | | | | 0.00 |
| 9/11/2008 | 0.00 | | | | | | | | 0.00 |
| 9/12/2008 | 0.00 | | | | | | | | 0.00 |
| 9/13/2008 | 0.00 | | | | | | | | 0.00 |
| 9/14/2008 | 0.00 | | | | | | | | 0.00 |
| 9/15/2008 | 0.00 | | | | | | | | 0.00 |
| 9/16/2008 | 0.00 | | | | | | | | 0.00 |
| 9/17/2008 | 0.00 | | | | | | | | 0.00 |
| 9/18/2008 | 0.00 | | | | | | | | 0.00 |
| 9/19/2008 | 0.00 | | | | | | | | 0.00 |
| 9/20/2008 | 0.00 | | | | | | | | 0.00 |
| 9/21/2008 | 0.00 | | | | | | | | 0.00 |
| 9/22/2008 | 0.00 | | | | | | | | 0.00 |
| 9/23/2008 | 0.00 | | | | | | | | 0.00 |
| 9/24/2008 | 0.00 | | | | | | | | 0.00 |
| 9/25/2008 | 0.00 | | | | | | | | 0.00 |
| 9/26/2008 | 0.00 | | | | | | | | 0.00 |
| 9/27/2008 | 0.00 | | | | | | | | 0.00 |
| 9/28/2008 | 0.00 | | | | | | | | 0.00 |
| 9/29/2008 | 0.00 | | | | | | | | 0.00 |
| 9/30/2008 | 0.00 | | | | | | | | 0.00 |
| | 0.00 | | | | | | | | 0.00 |

Balance per Aging
Calculated balance    0.00
Variance

## EXHIBIT C

## PATENTS, TRADEMARKS AND COPYRIGHTS

Trademarks in the United States

|  | Trademark | Serial/Reg. No. | Class |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Patents in United States

Copyrights in United States

**EXHIBIT D**

A.  Specific Insurance Requirements.

(i)  Property Insurance - An all risks property insurance policy, including coverage for fire, theft, collision, burglary, pilferage, loss in transit, explosion, spoilage, wind, hail, earthquake, flood, collapse, sinkhole and terrorism (domestic and foreign), for an amount not less than one hundred percent (100%) of the replacement cost of the Collateral (exclusive of costs for foundations, underground utilities and footings for any Collateral consisting of real property, if applicable) without deduction for physical depreciation.  Earthquake coverage will be required for any Collateral consisting of real property, if applicable, if the locations PML/SEL exceeds 20% with a limit equal to the PML/SEL. Earthquake deductibles shall not be greater than five percent (5%) of the total insured value of the property. If all or any portion of the improvements at any real property Collateral is, at any time during the term of this Agreement, located in a special flood hazard area or such other area as Lender may determine its reasonable discretion, flood coverage in an amount equal to (1) the maximum amount of such insurance available through the National Flood Insurance Program and (2) such additional flood coverage in form and substance and in amounts as may be reasonably required by Lender. "All risks" shall provide coverage for all direct damage to property except as specifically excluded by the policy.  Such all risks property insurance policy shall contain a 438 BFU endorsement, or an equivalent New York Standard Mortgagee (if applicable) and Lenders Loss Payable Endorsement (CG 12 18 06 95 provision "C" or its equivalent, and:   (A) no coinsurance provision or an agreed amount endorsement waiving any coinsurance provisions; (B) a deductible not to exceed $50,000; (C) if applicable, ordinance or law coverage including (1) loss in value to the undamaged portion of the building(s) to full replacement value, (2) demolition costs with a limit per loss of ten percent (10%) of the value of the building(s) affected by loss, and (3) increased costs of construction with a limit per loss of ten percent (10%) of the value of the building(s) affected by loss; (D) if applicable, equipment breakdown coverage including, but not limited to, loss or damage from electrical injury, machinery and equipment breakdown, and explosion of steam boilers, air conditioning equipment, high pressure piping, pressure vessels or similar apparatus; and (E) business income and/or loss of rents coverage, if applicable, in amount equal to the estimated net operating income and continuing expenses for the property for a period of twelve (12) months, which may be increased from time to time by Lender, with a 180 Day Extended Period of Indemnity (or such other period of time as may be needed, in Lender's discretion, to return to normal operating levels);

(ii)  Liability Insurance – (A) a commercial general liability policy insuring against claims for personal injury, bodily injury, death or property damage occurring upon, in or about Borrower's premises, to be on an "occurrence" form, with limits not less than $1,000,000 per occurrence and $2,000,000 general aggregate; (B) if applicable, a business automobile liability policy with symbol 1 with limits not less than $1,000,000 per accident; and (C) if applicable, a workers compensation policy with limits not less than statutory requirements for workers compensation and an employer's liability limit of not less than $1,000,000 each accident and $1,000,000 per employee and policy aggregate for bodily injury by disease.  Each commercial general liability policy shall contain a per location general aggregate if covering multiple locations; (D) if applicable, Products Recall expense and indemnity policy with a limit not less than $5,000,000 per occurrence and annual aggregate, (E) if applicable, Cyber Liability insurance with a limit of not less than $1,000,000 per occurrence and annual aggregate, and (F) such additional liability coverages as deemed necessary during the lender's loan due diligence process.

(iii)  Umbrella or Excess Liability Insurance –A commercial umbrella or excess liability policy with limits not less than $5,000,000 which, at a minimum, shall schedule the following policies as "underlying":  commercial general & products liability, business automobile liability and employer's liability.

(iv)     if applicable, a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage.

B. General Insurance Requirements.

(i)     All insurance premiums on all policies must be paid as and when due and payable, consistent with the past practices of Borrower. All outstanding premiums for the current policy term are to be paid prior to the effective date of such policy;

(ii)     No insurance policy required hereunder shall be permitted to provide for premium assessments to be made against Lender;

(iii)     Borrower shall provide the following prior to the effective date of such policy:  (i) an ACORD 25 or equivalent certificate of liability insurance and (ii) an ACORD 28 or equivalent certificate of property insurance;

(iv)     Prior to the renewal date of each insurance policy required hereunder, Borrower shall provide certificates of insurance providing evidence that the policies have been renewed on forms ACORD 28 and ACORD 25;

(v)     Borrower shall provide promptly upon Lender's request complete copies of the insurance policies providing the coverage required hereunder;

(vi)     Each property policy and to the extent possible, each liability policy shall contain a provision providing not less than thirty (30) days' prior written notice to Lender of cancellation and not less than ten (10) days' prior written notice to Lender of cancellation for non-payment of premium;

(vii)     Lender is to be named (A) the first mortgagee (if applicable) and first lender loss payee with respect to the property insurance coverage, and (B) an additional insured with respect to general liability and umbrella or excess liability insurances, as follows:  Rosenthal & Rosenthal, Inc., 1370 Broadway, New York, NY 10018.

(viii)     A waiver of subrogation shall be provided on all liability policies of insurance waiving rights of recovery against Lender; and

(ix)     The limits of insurance contained herein are minimum limits established by Lender and shall not be construed to mean that Lender represents or warrants that the required limits contained herein are adequate for protection to Borrower, nor limit the liability of Borrower to the limits stated herein.

**EXHIBIT E**
**BUDGET**

[see attached]